**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

1  DANIEL O. HANKS (*pro hac vice*)
2  dhanks@ftc.gov; 202-326-2472
   JASON SANDERS (*pro hac vice*)
3  jsanders1@ftc.gov; 202-326-2357
4  Federal Trade Commission
   600 Pennsylvania Ave NW
5  Washington, DC  20580
6  Fax:  202-326-3768

7  CARLA L. CHEUNG, SBN 291562 (Local Counsel)
8  ccheung1@ftc.gov; 310-824-4300
   Federal Trade Commission
9  10990 Wilshire Blvd., Suite 400
10 Los Angeles, CA 90024
11 Fax:  310-824-4318

12 ATTORNEYS FOR PLAINTIFF

13

14              UNITED STATES DISTRICT COURT

15              CENTRAL DISTRICT OF CALIFORNIA

16

17 FEDERAL TRADE                    )   **Case No. 2:24-cv-9566**
18 COMMISSION,                      )
                                    )
19               Plaintiff,         )   **COMPLAINT FOR PERMANENT**
                                    )   **INJUNCTION, MONETARY**
20                                  )   **JUDGMENT, AND OTHER**
21          v.                      )   **RELIEF**
                                    )
22 DAVE, INC., a Delaware           )
23 corporation,                     )
                                    )
24               Defendant.         )
25                                  )

26

27      Plaintiff, the Federal Trade Commission ("FTC" or "Commission"), for its

28 Complaint alleges:

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

1.    The FTC brings this action for Defendant's violations of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and Section 4 of the Restore Online Shoppers' Confidence Act ("ROSCA"), 15 U.S.C. § 8403.  For these violations, the FTC seeks relief, including a permanent injunction, monetary relief, and other relief, pursuant to Sections 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b) and 57b, and ROSCA, 15 U.S.C. § 8404.

### SUMMARY OF THE CASE

2.    Dave operates a personal finance mobile application that it advertises as offering short-term cash advances.  Dave describes the market for its mobile app as consumers who are "financially vulnerable" or "financially coping," including those whose spending exceeds their income, who have minimal savings, and who overdraft their bank accounts frequently.

3.    Much of Dave's advertising is dominated by text and images urging consumers to "get up to $500" with Dave "instantly," simply by downloading the app.  In reality, however, few consumers who download and use Dave's app receive cash advance offers of $500, or of amounts anywhere near $500.  In the first 14 months after Dave began advertising advances of up to $500, when determining whether and in what amount to offer an advance to a new user, ███ ████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ████████████████████████████████████████████ And despite Dave's claims about "instant" cash, those who are able to get an advance must pay a previously undisclosed "Express Fee" of $3 to $25 in order to avoid waiting two to three business days for their money.

4.    On many advances, Dave takes an additional charge—by default, 15% of the advance—that Dave refers to as a "tip."  Many consumers are either unaware that Dave is charging them or unaware that there is any way to avoid being charged.  Dave also falsely claims that, based on the consumer's payment of

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

this charge, Dave will pay for or donate a specified number of meals to feed hungry children. In truth, however, Dave does not provide the meals as claimed, and instead makes only a token charitable donation—usually $1.50 or less—while keeping the bulk of the charge for itself.

5.      Dave also charges all consumers—even those who cannot get an advance—a $1 monthly membership subscription fee, frequently without their knowledge or consent. Consumers who realize that Dave has been charging them and seek to stop the charge often find that Dave's mechanisms for doing so are unavailable or effort-intensive.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345.

7.      Venue is proper in this District under 28 U.S.C. § 1391(b)(1), (b)(2), (c)(2), and (d), and 15 U.S.C. § 53(b).

## PLAINTIFF

8.      The FTC is an independent agency of the United States Government created by the FTC Act, which authorizes the FTC to commence this district court civil action by its own attorneys. 15 U.S.C. §§ 41–58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce. The FTC also enforces ROSCA, 15 U.S.C. §§ 8401–8405, which, *inter alia*, prohibits the sale of goods or services on the Internet through negative option marketing without meeting certain requirements to protect consumers. A negative option is an offer in which the seller treats a consumer's silence—their failure to reject an offer or cancel an agreement—as consent to be charged for goods or services. 16 C.F.R. § 310.2(w).

## DEFENDANT

9.      Defendant Dave, Inc., ("Dave") is a Delaware corporation with its principal place of business at 1265 South Cochran Avenue, Los Angeles,

-3-

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

California.  Dave transacts or has transacted business in this District and throughout the United States.  At all times relevant to this Complaint, acting alone or in concert with others, Dave has advertised, marketed, distributed, or sold a personal finance mobile application that offers short-term cash advances to consumers throughout the United States.

## COMMERCE

10.     At all times relevant to this Complaint, Defendant has maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANT'S BUSINESS ACTIVITIES

11.     Dave operates a personal finance mobile application that is available for download through the Apple App Store and Google Play Store.  Dave advertises its app as a tool that offers short-term cash advances to cover unexpected emergencies and avoid the financial penalties (such as overdraft fees) that can attend them.  Dave calls its advances "Extra Cash" and says consumers can receive amounts "up to $500."

12.     Dave requires consumers who use its app to provide information about their bank accounts to "link" them to the Dave app.  Dave uses this information to debit consumers' bank accounts to collect on advances and other charges.

### Dave Deceptively Advertises "Instant" Cash Advances of Up to $500

13.     Dave advertises its app to consumers online and through social media. Dave represents in its advertising that consumers can obtain cash advances of up to $500 whenever they need them.  That amount has increased over time; in earlier periods, Dave advertised advances of up to $75, $100, and $250.  Dave's advertisements emphasize that consumers can receive cash "instantly," "on the spot," "now," and "in under 5 minutes"; "[a]ll you have to do is download this app."  Dave reinforces these claims in the Apple App and Google Play Stores,

-4-

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

where consumers download the app, and on the app itself, during the process of enrolling with Dave.

14.  In reality, only a miniscule number of consumers who respond to Dave's advertising by downloading the app are offered cash advances in amounts anywhere close to the amounts advertised, and many are not offered any cash advance at all.  And consumers who are offered an advance must pay an "Express Fee" of $3 to $25 to avoid a delay of two to three business days in receiving the funds Dave promised "instantly."

*Misrepresentations Online and in Social Media*

15.  Since at least 2020, Dave has advertised its cash advance product on social media platforms such as Facebook, Instagram, and TikTok.  Most of Dave's users come to the app through an ad.  Dave's ads expressly and prominently tell consumers that they will be able to receive cash advances of up to $500, "instantly," or "in under 5 minutes," if they download the Dave app.  Examples of these ads appear below.





REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15

 

16    16.    Dave's ads emphasize that consumers can get up to $500 immediately
17  after downloading the app.  Dave's video ads often feature fictitious scenarios in
18  which a stuffed bear representing Dave appears before an actor facing a difficult
19  financial situation and, often through a zap of green lightning, appears to transfer
20  $500 to the actor's smartphone.  Phrases like "Tap for up to $500," "Get up to
21  $500 on the spot," "instantly," and "Get cash now" appear onscreen throughout a
22  typical ad of this type.  A voiceover in these ads typically states, "Download Dave
23  and get up to $500 instantly.  No interest.  No credit check."
24    17.    Dave's ads have contained similar messages for years.  When the
25  maximum amount Dave offered was $75 and later $100, Dave's ads told
26  consumers Dave could "instantly send [them] up to $75.  Just pay it back in 10
27  days."  And that "All [they] need to do is download this app" to receive up to the
28  maximum amount "in 90 seconds."  Examples of these ads appear below.

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**




18.     Many of Dave's ads promoting instant cash show screens from the user experience inviting consumers to select an amount up to $500.  Examples of these ads appear below.




**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

19.    Other Dave video advertisements depict fictitious scenarios in which actors are shown learning about the Dave app and immediately receiving $500.  In one ad, for example, an actor is shown at a gas pump, unable to afford gas for his car.  A stuffed bear appears, holding a phone that prominently shows "$500" on its screen.  The bear introduces himself as "Dave" and explains that it can get the actor "up to $500 of your future money, now."  The actor asks, "$500?  Instantly?"  The bear confirms: "instantly."  When the actor looks at his phone, the screen reads, "Your $500 is on its way."  A voiceover in ads states, "Download Dave and get up to $500 instantly.  No interest.  No credit check."

20.    In another video ad, a stuffed bear sits silently under two lines of text that read "Get up to $500 instantly" and "Download Dave now."  Next, a door falls off a cabinet in the background.  The bear then says, "Expect the unexpected.  Download Dave.  Get up to $500 instantly, when you need it most."  The next screen contains a smartphone prominently displaying the text "$500," the Dave logo, and the text "Get your future money now.  No interest.  No credit check."

*Misrepresentations in the Enrollment Process*

21.    Dave's app store content repeats and reinforces Dave's advertising claims that consumers are just moments away from receiving "up to $500" if they download the Dave app.  Once consumers download the app, Dave emphasizes these claims again in the enrollment process through which Dave obtains access to consumers' bank accounts by having them "link" their account to the app.

22.    Consumers can download the Dave app to their smartphones through the Apple App Store or the Google Play Store.  In the Google Play Store, for example, a search for Dave's app will pull up a listing that invites consumers to "Advance up to 500 dollars."  A consumer who swipes through the app listing's carousel of advertising screens will again see the claim that consumers can receive "up to $500 in 5 minutes or less."  Similar content appears in the Apple App Store.

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

23.    After consumers download and open the Dave app on their smartphones, consumers encounter a welcome screen that tells them, "Get up to $500 when you need it*" and shows a smartphone screen displaying an available balance of $500.  The screen includes a large, prominent green button that invites consumers to "Sign up for Dave."  An example of this screen follows:



24.    The app ushers consumers through a series of enrollment screens in which consumers must, among other things, create a sign-in ID using their email address and enter their name and phone number.  Consumers are then posed a prompt—"What can we help you with today?"—for which one of the responses is "Accessing up to $500."  A consumer who selects that option is taken to a screen which states, "Get an ExtraCash advance up to $500*."  An example of this screen follows:

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**



25.    A prominent green button at the bottom of the screen invites consumers to "Get started."  After a consumer taps "Get started," Dave has displayed a screen headed "Connect your primary bank," with a bright green button at the bottom labeled "Connect account":[1]

---

[1] In the spring of 2024, while aware of the FTC's investigation, Dave changed the button on the screen headed "Connect your primary bank" to "Agree and continue" and made other minor changes to this screen.



26.     Even if a consumer were to tap on and review the content hidden behind either the "See terms" link on the screen headed "Get up to $500 when you need it*" or on the "See how ExtraCash works" link on the screen headed "Get an ExtraCash advance up to $500*," they would not be shown any of the following information:  (i) that Dave offers cash advances at or near the amounts advertised to very few consumers; (ii) that consumers cannot obtain cash advances without waiting two to three business days unless they pay an additional fee, and the details of that fee; (iii) the steps consumers must take to avoid being subject to an additional charge that Dave refers to as a "tip"; and (iv) that Dave charges consumers a recurring membership subscription fee.

27.     Immediately after consumers tap "Connect account," Dave solicits information about their bank accounts to "link" the accounts to Dave.  Dave uses this information to collect on advances and take other charges from consumers' bank accounts.

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

28.    After a consumer has granted Dave access to their bank account and completed the enrollment process, the Dave app shows the consumer different screens depending on whether Dave is offering the consumer an advance.  Each time the consumer later uses the app and accesses either the home screen or the "Extra Cash" section of the app, Dave makes a fresh determination of whether to offer the consumer an advance.  If Dave offers the consumer an advance, it displays the advance amount on the screen.

### Dave Offers Far Less in Cash Advances Than Advertised and Charges Multiple Undisclosed Fees

29.    After enrolling, the overwhelming majority of consumers discover that Dave either will not offer them a cash advance at all, or will only offer them advances that are much smaller than advertised.

30.    Making matters worse, Dave charges consumers at least three types of fees that it does not clearly and conspicuously disclose before it obtains access to their bank accounts:

     a.    an "Express Fee" of $3 to $25 to get an advance instantly, as advertised, instead of two to three business days later;

     b.    an additional charge—imposed in many instances without the consumer's knowledge or consent—that Dave refers to as a "tip" and falsely claims will cause it to donate a specific number of meals to feed hungry children; and

     c.    a $1 monthly membership fee, also frequently imposed without consumers' knowledge or consent.

*Dave Provides Far Less Than the Advertised Cash Advance*

31.    Despite Dave's numerous prominent claims that consumers will receive cash advances of up to $500, few customers are offered anything close to that, if Dave offers them anything at all.  In the first 14 months after Dave began advertising advances of up to $500, when determining whether and in what amount

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

1  to offer an advance to a new user, ███████████████████████████

2  ██████████████████████████████████████████

3  ██████████████████████████████████████████

4  ██████████████████████████████████████

5  ██████

6        32.    ██████████████████████████████

7  ██████████████████████████████████████

8  ██████████████████████████████████████████

9  ██████████████████████████████████████████

10 ██████████████████████████████████████████

11 ██████████████████████████████████████

12 ████████████

13       33.    Consumers who are not new to Dave also receive offers that are much

14 less than advertised.  In the first 14 months after Dave began advertising advances

15 of up to $500, ██████████████████████████████

16 ██████████████████████████████████████

17 ██████████████████████████████████████████

18 ██████████████████████

19       34.    Neither Dave's ads nor its app store content inform consumers that

20 Dave offers cash advances at or near the amount advertised to very few consumers.

21 Other than prominent representations such as "Get up to $500," the only references

22 to the amount of consumers' advances in Dave's advertising or app store listings

23 typically are in small print, are buried in block text, use vague or confusing

24 language, and/or are found in obscure locations.

25       35.    Many consumers believe Dave's claims that they will get up to $500

26 upon enrolling.  One consumer reported that Dave "[c]laims you can borrow up to

27 500.00 dollars. But, I only was able to get 25.00. Not very helpful."  Another

28 consumer wrote that they "have not been able to do any advances at all[;] my

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

advance amount stays at zero but yet I get emails daily with lies that they do $500 advances[;] just a scam in my opinion."  Yet another consumer complained that Dave's advertising was "[m]isleading....you're not guaranteed $400 or $500."

36.    Many consumers make clear that they would not have signed up for Dave if they had known Dave would offer far less than promised.  One consumer tried to cancel because "[d]espite making decent money, they wouldn't loan me more than $5."  Another consumer complained they "got 2 small cash advances and paid them OFF ON TIME. They kept promising 500 for the past month and NEVER delivered. I Uninstalled this useless app from this useless company."  Yet another consumer said "I downloaded Dave because I needed some money[;] they say u can get up to 500 well they only allowed me 25 . . . to me it was just a waste of my time. . . . I paid them back and will be deleting this account."  Still another consumer reported, "Every time you'll tell me you're going to give me $500[] Advance I put in my bank Information . . . . And then you never do it. . . . Stop with the lies."

37.    Internal documents reflect that █████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
██████████████████

38.    ███████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

*Dave Charges an Undisclosed Fee to*

*Get Cash Advances "Instantly," as Advertised*

39.     Although Dave advertises that consumers will receive funds "instantly," "on the spot," "now," and "in under 5 minutes," Dave in fact requires consumers to wait two to three business days before receiving their advance unless they pay Dave a previously undisclosed "Express Fee" of $3 to $25.

40.     Consumers who open the Dave app for the first time and proceed directly to attempt to take an advance will see the Express Fee only after they have connected their bank accounts and are accepting an advance offered by Dave.

41.     Instead, the earlier screens that a consumer encounters in attempting to take an advance include only a vague statement on this topic.  The screen headed "Connect your primary bank," pictured in Paragraph 25 above, contains in text that is smaller and fainter than either the screen's bold-print heading or the large green button labeled "Connect account," the statement "Get money instantly for a small fee."  This statement does not inform consumers that, if they do not pay the unspecified "small fee," Dave will require them to wait two to three business days before receiving their advanced funds.  This statement also does not inform consumers of the amount of the fee, which ranges from $3 to $25.

42.     Similarly, neither Dave's ads nor its app store content inform consumers that Dave in fact requires consumers to wait two to three business days before receiving their advance unless they pay Dave an "Express Fee" of $3 to $25.  While Dave makes prominent representations that consumers will receive funds "instantly," "on the spot," "now," and "in under 5 minutes," Dave's only

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

references to Express Fees in its advertising or at the app stores typically appear in small print, are buried in block text, use vague or confusing language, and/or are found in obscure locations, and do not state that unless consumers pay an Express Fee, Dave will require them to wait two to three business days before receiving their advance.

*Dave Deceives Consumers About Whether*

*They Are Being Charged for a "Tip" and Whether the Charge Is Avoidable*

43.    After accepting an advance offered by Dave and selecting a transfer method, consumers are taken to a screen headed "Your advance is on its way!":



44.    A large green button labeled "Thank you!" appears at the bottom of the screen.  Dave charges consumers who simply tap the "Thank you!" button an extra 15% of their advance.  Dave calls this charge a "tip."

45.    Many consumers who tap the "Thank you!" button are surprised to

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

later learn that Dave has charged them an extra 15% of their advance.  Dave does not mention the charge in its advertising, and consumers who open the Dave app for the first time and proceed directly to attempt to take an advance do not encounter any mention of this charge, or how to avoid being subject to it, before granting Dave access to their bank accounts.

46.    Many consumers have been unknowingly subject to the extra charge that Dave calls a "tip."  Many others understood this extra charge to be an unavoidable part of Dave's advance process.  Consumer complaints include the following:

a.    "They will add a tip without your knowledge."

b.    "[I]t forces you to tip."

c.    "[M]akes you tip them . . . ."

d.    "[I]t does not give me an option to not leave a tip."

e.    "Don't hit 'thank you' on tip screen, you'll see many ppl say this.  It counts as agreeing to high tip & IS SNEAKY."

f.    "The interface is set up to trick you into giving the tip. . . .  I feel cheated/scammed by this whole process."

g.    "[T]hey make you give a tip when you don't want to give one . . . ."

h.    "App is very deceptive and impossible to get help.  It asks for a 'tip' when you get an advance, and it's not obvious or clear how NOT to tip."

i.    "Deceptive, riddled with fees and default 15% tip.  This app is toxic and exploiting those who want honest financial products.  Shame on you."

j.    "Absolute awful app, tricks you into giving them a tip whenever you advance money.  DO NOT USE!!!!"

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

47.    Internal Dave documents acknowledge both that █████████

48.    ████████████████████████████████████

49.    ████████████████████████████████████

50.    In an online chat between two Dave employees █████████

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

*Dave Deceptively Represents That It Will Pay for or Donate*
*a Specified Number of Meals Based on the "Tip" Charged to the Consumer*

51.     In addition to deceiving consumers about whether they are being charged and whether the charge is required, the screen headed "Your advance is on its way!" deceptively represents that, based on the consumer's payment of a charge that Defendant refers to as a "tip," Dave will pay for or donate a specified number of "healthy meals" for children in need.

52.     The content between the bold-print "Your advance is on its way!" heading and the large green "Thank you!" button features images of a smiling cartoon child holding a spoon who is surrounded by various food items:



53.     Beneath the images of the child and nine food items are three boxes labeled "10 Healthy Meals," "15 Healthy Meals," and "20 Healthy Meals."  If the consumer taps on "20 Healthy Meals," the number of food items around the child increases to twelve.  If the consumer taps on "10 Healthy Meals," the number of

-19-

food items around the child drops.

54.     Many consumers tap the prominent green "Thank you!" button on this screen.  Dave charges these consumers between 10% and 20% of their advance amount.

55.     To avoid this outcome, consumers must first notice and tap the "Leave a custom tip" button, which is about half as long as the "Thank you!" button and— unlike the "Thank you!" button, which is colored green against a white background—is colored white against a white background.  If consumers tap this button, the three labeled boxes are replaced with a horizontal "slider."  Initially, above the slider in large, bold-print text appear the words "15 Healthy Meals" and an image of the cartoon child holding a spoon and surrounded by ten food items.

56.     If the consumer moves the slider to the right, the number of "Healthy Meals" displayed increases incrementally up to 25.  As the count of "Healthy Meals" increases, more food items appear around the cartoon child, with twenty-five items filling the screen when the count of "Healthy Meals" reaches 25:



**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

57.     If the consumer moves the slider to the left, the number of "Healthy Meals" displayed decreases incrementally down to 0.  As the slider moves to the left and the count of "Healthy Meals" decreases, food items disappear from around the child.  If the count of "Healthy Meals" reaches 2, the only items around the child are bread and water.

58.     To prevent Dave from charging them, the consumer must move the slider fully to the left to reduce the count of "Healthy Meals" to zero.  The slider then turns from green to red, the text of the large green button at the bottom of the screen changes from "Thank you!" to "No tip," and the image of the child is replaced by an image of an empty plate with a fork and spoon.

59.     The combination of the prominent imagery of multiple food items surrounding the cartoon child and the bold-print language about the provision of 10, 15, or 20 "Healthy Meals" leads consumers to believe that, if the consumer permits Dave to charge a large "tip," Dave will pay for or donate a specified number of meals for children in need.

60.     In truth, however, Dave does not pay for or donate a specified number of meals to children in need based on the consumer's payment of a charge that Defendant refers to as a "tip."  Instead, for each percentage point of a "tip" charged to a consumer, Dave donates only 10 cents, and keeps the rest.  For example, in the screen shown at Paragraph 52, if the consumer were to tap the "Thank you!" button, Dave would not pay for or donate "15 Healthy Meals" as stated in bold print surrounded by images of numerous food items, but would instead donate only $1.50 to a hunger relief organization.  For that organization to provide 15 meals requires not merely $1.50 but also approximately 18 pounds of food, which Dave does not provide.

61.     Dave has acknowledged in internal documents that its ██████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**



Despite this, Dave continues to subject consumers who use its app to the "Healthy Meals" content.

62. Dave's deceptive "Healthy Meals" content succeeds in affecting consumer behavior.

63.

64.

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████ Dave has continued to present the initial screen with the three "Healthy Meals" boxes to the overwhelming majority of consumers who use its app.

*Dave Takes an Undisclosed Monthly Charge From Consumers' Accounts*

65.    Immediately before obtaining access to consumers' bank accounts, Dave displays a screen headed "Connect your primary bank," with a bright green button at the bottom labeled "Connect account":



66.    Unbeknownst to many consumers, Dave enrolls consumers who tap the "Connect account" button in a subscription that automatically renews each month.  Dave charges these consumers $1 monthly on a recurring basis unless the consumer takes affirmative action to stop the charge.  As Dave has acknowledged

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

in an internal document, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

67.    Consumers have complained that they did not agree to be charged the membership fee and did not know it existed until after they were charged. Examples include the following:

    a.    "They charge a $1 a month 'membership fee' which is never disclosed to you once while setting up the account."

    b.    "DON'T SIGN UP Unknowingly started charging me $1 a month . . . ."

    c.    "They just started charging me a monthly fee with no notice. Watch any card you have used in this app."

    d.    "Huge SCAM.  After signing up and realizing they would loan me $50[,] I used another source.  Then they announced they decided to charge a fee, After the fact.  Without my consent."

    e.    "[N]oticed they are charging me a membership fee.  Its only $1 but I didn't know about it and had never taken any loan from them.  Maybe if they had told me upfront I would be opted into their membership system . . . I would have been able to cancel it with no hard feelings after . . . ."

    f.    "screw your app I never asked to get charged a subscription fee and then I later got charged for it . . . I never asked to get charged this at all and you otherwise authorized it without my permission"

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

g.      "Never agreed to a membership, but they used my checking account information to take a membership fee even when my debit card was locked.  Very dissatisfied with this."

68.      Consumers who open the Dave app for the first time and proceed directly to attempt to take an advance only encounter any mention of the existence of the $1 membership fee on the screen headed "Connect your primary bank." This appears in text that is smaller, lighter, and/or less prominent than either the heading or the bright green button labeled "Connect account."

**Dave Fails to Provide Simple Mechanisms**
**for Consumers to Stop the Recurring Charge**

69.      Dave fails to provide simple mechanisms for consumers to stop the recurring $1 "membership" charge.  In the words of one consumer, "I've tried leaving, but they literally will not let me go.  I had to fight with them to delete my account, and I kept getting charged the membership fee. . . .  LEAVE ME ALONE. I HATE DAVE."

70.      Consumers who realize that Dave is charging them every month and want to stop it have often been unable to find an in-app process to do so, either because Dave has not provided one, because Dave does not prominently inform consumers how to stop the charge, or for both reasons.

71.      Dave has withheld an in-app process for stopping the recurring charge from many consumers.  Indeed, from at least August 2021 through November 2022, Dave did not allow *any* consumers to stop the recurring charge through an in-app process if they had also opened a Dave bank account (which Dave, beginning in early 2022, required all new consumers to have if they wanted advances).  And for months after November 2022, Dave continued to withhold an in-app process from many consumers.

72.      Additionally, Dave does not prominently inform consumers how to stop the recurring charge, including what options exist for stopping the charge,

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

what rules apply to those options, or where any in-app processes for stopping the charge can be found.  Instead, consumers must themselves attempt to hunt down this information.

73.   Some consumers are convinced that there is no way to stop the recurring charge.  For example, consumers have complained that "[t]hey continue to charge me $1 every single month with no way to opt out" and "[t]here is no way to unsubscribe and they keep charging me." ████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

74.   Dave has obscured information about mechanisms for stopping the recurring charge to such a degree that ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████ :

████████████████████████████████████████

████████████████████████████

████████████████████

██████

75.   Some consumers who are unable to find an in-app process send a message to Dave customer service asking to cancel the charge.  Dave does not simply stop the recurring charge in response to such messages.  Instead, Dave will do one or more of the following:  (a) point the consumer to an in-app process that may or may not be available for the consumer; (b) deny that Dave customer service has the ability to stop the charge for the consumer; or (c) demand, in order to

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

cancel or "pause" the charge, that the consumer provide multiple points of personal and/or financial account information.  The information demanded by Dave has varied but has included date of birth, phone number used to sign up for Dave, full mailing address, last four digits of the consumer's social security number, and details about the last two transactions on the consumer's external bank account.

76.     Some consumers find that Dave fails to act in response to requests to stop the charge.  As one consumer warned, "DO NOT DOWNLOAD THIS. EXTREMELY HARD TO CONTACT ANYONE.  THEY DON'T DELETE YOUR ACCOUNT WHEN ASKED."  Another consumer wrote that "[t]he Dave app won't let me close my account . . . .  I've literally been trying everyday for the last 2 weeks, I have emailed no response, reached out for assistance no help, why won't it let me close it?  . . . They just want to keep me locked in so that can continue to take 1$ a month from me."

77.     Dave's demands for sensitive information from consumers are another roadblock to stopping the charge.  ███████████████████████
███████████████████████████████████████████████
███████████████████████████████████████
████████████████████   One consumer stated that "[t]hey refuse to cancel my account and just tell me that I need to send more and more sensitive personal information in a sloppy email to someone named 'Ambear.' "  For another consumer who wanted to "pause" her account, it took twenty-seven days, nine messages to customer support, and a threat to contact the Better Business Bureau to get Dave to stop charging her.

78.     Moreover, consumers who learn where to find Dave's in-app processes for stopping the recurring charge often find that these processes are not simple.  For example, Dave requires a consumer starting on the app's main screen to take at least nine separate steps to reach and complete Dave's current in-app cancellation process.  In parts of Dave's in-app process, consumers are diverted

1   from cancellation if they select the most prominent option on the screen. ████

2   ████████████████████████████████████████████████████████

3   ████████████████████████████████████████████████

4   ████████████████████████████████████████████████████

5   ███████████████████████████████████████████

6   ████████████████████████████████████████████████████

7   ████████████████████████████

8       79.    Beyond all this, in some instances, Dave has denied consumers any

9   mechanism for stopping the recurring charge, let alone simple mechanisms.

10  Specifically, Dave at times has refused to stop the recurring charge when,

11  according to Dave, the consumer has not yet fully repaid an advance. ████████

12  ████████████████████████████████████████████████████████

13  ██████████████████████████████████████████

14  ███████████████    And, in the following years, customer service representatives

15  have repeatedly informed consumers that they cannot "pause" or cancel to stop the

16  recurring charge because Dave is claiming that they have an unpaid advance.

17      80.    Based on the facts and violations of law alleged in this Complaint, the

18  FTC has reason to believe that Defendant is violating or is about to violate laws

19  enforced by the Commission because, among other things:

20              a.    Defendants have engaged in their unlawful acts and practices

21                    repeatedly over a period of years;

22              b.    Defendants have earned significant revenues from participating

23                    in these unlawful acts and practices;

24              c.    Defendants have continued their unlawful acts or practices

25                    despite knowledge of numerous complaints; and

26              d.    Defendants have an incentive to continue to engage in

27                    violations and retain the means and ability to do so.

28

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

## VIOLATIONS OF THE FTC ACT

81.    Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

82.    Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

### Count I:  Misrepresentations Regarding Cash Advance Amounts

83.    In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of its cash advance services, Defendant represents, directly or indirectly, expressly or by implication, that the consumer can get a cash advance of up to the advertised amount.

84.    Defendant's representations as described in Paragraph 83 are false or misleading or were not substantiated at the time the representations were made.

85.    Therefore, Defendant's representations as described in Paragraph 83 constitute a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

### Count II:  Misrepresentations Regarding "Tipping" Charges

86.    In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of its cash advance services, Defendant represents, directly or indirectly, expressly or by implication, that

a.    tapping the "Thank you!" button on the screen headed "Your advance is on the way!" simply concludes the transaction;

b.    the charge that Defendant refers to as a "tip" is unavoidable; and

c.    based on the consumer's payment of a charge that Defendant refers to as a "tip," Defendant will pay for or donate a specified number of meals for children in need.

87.    Defendant's representations as described in Paragraph 86 are false or misleading or were not substantiated at the time the representations were made.

88.     Therefore, Defendant's representations as described in Paragraph 86 constitute a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## VIOLATIONS OF THE
## RESTORE ONLINE SHOPPERS' CONFIDENCE ACT

89.     In 2010, Congress passed the Restore Online Shoppers' Confidence Act, 15 U.S.C. §§ 8401 *et seq.*, which became effective on December 29, 2010. Congress passed ROSCA because "[c]onsumer confidence is essential to the growth of online commerce. To continue its development as a marketplace, the Internet must provide consumers with clear, accurate information and give sellers an opportunity to fairly compete with one another for consumers' business." Section 2 of ROSCA, 15 U.S.C. § 8401.

90.     Section 4 of ROSCA, 15 U.S.C. § 8403, generally prohibits charging consumers for goods or services sold in transactions effected on the Internet through a negative option feature, as that term is defined in the Commission's Telemarketing Sales Rule ("TSR"), 16 C.F.R. § 310.2(w), unless the seller (1) clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information, (2) obtains the consumer's express informed consent before making the charge, and (3) provides a simple mechanism to stop recurring charges. 15 U.S.C. § 8403.

91.     The TSR defines a negative option feature as a provision in an offer or agreement to sell or provide any goods or services "under which the customer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer." 16 C.F.R. § 310.2(w).

92.     As described in Paragraphs 11 to 79, Defendant advertises and sells its Dave membership through a negative option feature as defined by the TSR. 16 C.F.R. § 310.2(w).

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

93.     Pursuant to Section 5 of ROSCA, 15 U.S.C. § 8404, and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of ROSCA constitutes an unfair or deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

### Count III:  Failure to Provide Clear and Conspicuous Disclosures

94.     In numerous instances, in connection with charging consumers for goods or services sold in transactions effected on the Internet through a negative option feature, as described in Paragraphs 11 to 79 above, Defendant has failed to clearly and conspicuously disclose before obtaining consumers' billing information all material transaction terms, including the following:

      a.     that Defendant offers cash advances at or near the amounts advertised to very few consumers;

      b.     that consumers cannot obtain cash advances without waiting two to three business days unless they pay an additional fee, and the details of that fee;

      c.     that Defendant charges consumers an additional fee that it refers to as a "tip," and the steps consumers must take to avoid being charged; and

      d.     that Defendant charges consumers a recurring membership subscription fee.

95.     Therefore, Defendant's acts or practices, as described in Paragraph 94, violate Section 4 of ROSCA, 15 U.S.C. § 8403, and Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

### Count IV:  Failure to Obtain Express Informed Consent

96.     In numerous instances, in connection with charging consumers for goods or services sold in transactions effected on the Internet through a negative option feature, as described in Paragraphs 11 to 79 above, Defendant has failed to obtain a consumer's express informed consent before charging the consumer's

-31-

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

credit card, debit card, bank account, or other financial account for products or services through such transaction.

97.     Therefore, Defendant's acts or practices, as described in Paragraph 96, violate Section 4 of ROSCA, 15 U.S.C. § 8403, and Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**Count V:  Failure to Provide Simple Mechanisms to Stop Recurring Charges**

98.     In numerous instances, in connection with charging consumers for goods or services sold in transactions effected on the Internet through a negative option feature, as described in Paragraphs 11 to 79 above, Defendant has failed to provide simple mechanisms for a consumer to stop recurring charges from being placed on the consumer's credit card, debit card, bank account, or other financial account.

99.     Therefore, Defendant's acts or practices, as described in Paragraph 96, violate Section 4 of ROSCA, 15 U.S.C. § 8403, and Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**CONSUMER INJURY**

100.   Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendant's violations of the FTC Act and ROSCA.  Absent injunctive relief by this Court, Defendant is likely to continue to injure consumers and harm the public interest.

**PRAYER FOR RELIEF**

101.   Wherefore, the FTC requests that the Court:

A.     Enter a permanent injunction to prevent future violations of the FTC Act and ROSCA;

B.     Award monetary and other relief within the Court's power to grant; and

C .    Award any additional relief as the Court determines to be just and proper.

Respectfully submitted,

Dated:  November 5, 2024                    /s / Daniel O. Hanks

DANIEL O. HANKS
dhanks@ftc.gov; 202-326-2472
JASON SANDERS
jsanders1@ftc.gov; 202-326-2357
Federal Trade Commission
600 Pennsylvania Ave NW
Washington, DC  20580
Fax:  202-326-3768

CARLA L. CHEUNG
ccheung1@ftc.gov; 310-824-4300
Federal Trade Commission
10990 Wilshire Blvd., Suite 400
Los Angeles, CA  90024
Fax: 310-824-4318

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION