BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General, Civil Division
BURDEN H. WALKER
Deputy Assistant Attorney General
AMANDA N. LISKAMM
Director, Consumer Protection Branch
LISA K. HSIAO
Senior Deputy Director, Civil Litigation
ZACHARY A. DIETERT
Assistant Director
SARAH WILLIAMS
Senior Trial Attorney
SEAN Z. SAPER
JOHN F. SCHIFALACQUA
Trial Attorneys
Consumer Protection Branch
Civil Division, United States Department of Justice
450 5th Street, NW, Suite 6400-South
Washington, D.C. 20001
Phone: (202) 616-4269 (Williams)
sarah.williams@usdoj.gov

ATTORNEYS FOR PLAINTIFF

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>DAVE, INC., a Delaware corporation, and JASON WILK, an individual,<br><br>Defendants. | Case No. 2:24-cv-09566-MRA-AGR<br><br>**AMENDED COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, CIVIL PENALTY JUDGMENT, AND OTHER RELIEF**<br><br>DEMAND FOR JURY TRIAL |

Plaintiff, the United States of America, acting upon notification and referral from the Federal Trade Commission ("FTC" or "Commission"), for its Amended Complaint alleges:

## SUMMARY OF THE CASE

1. Defendant Dave, Inc. ("Dave"), under the leadership and direction of its co-founder and CEO, Defendant Jason Wilk, operates a personal finance mobile application (the "app") and markets it to consumers Dave considers "financially vulnerable" or "financially coping," including those whose spending exceeds their income, who have minimal savings, and who overdraft their bank accounts frequently.

2. Much of Dave's advertising is dominated by text and images urging consumers to "get up to $500" with Dave "instantly," simply by downloading the app. In reality, however, Dave takes consumers' bank account information and charges them for an automatically renewing monthly subscription and other fees while failing to clearly disclose important information about what Dave users will be receiving, what they will be paying, and what those payments are used for. Few consumers who download Dave's app and give it access to their bank accounts receive amounts anywhere near $500. During the first 14 months after Dave began advertising advances of up to $500, when determining whether and in what amount to offer an advance to a new user, Dave offered a $500 advance only 0.002% of the time: a rate of less than 1 in 45,000. When Dave did offer an advance, its most common offer was $25. More than three-quarters of the time, however, Dave did not offer a new user any advance at all. And despite Defendants' claims about "instant" cash, consumers who are offered an advance must pay an "Express Fee" of $3 to $25 that is not fully disclosed upfront to avoid waiting two to three business days for the advance.

3. On many advances, Dave takes an additional charge—by default, 15% of the advance—that Dave refers to as a "tip." Due to the app's design, many

consumers are either unaware that Dave is charging them or unaware that there is
any way to avoid being charged. Dave also falsely suggests that, based on how
much the consumer "tips," Dave will donate enough to charity to provide a
specified number of meals to feed hungry children. In truth, however, Dave does
not donate to charity as claimed, but instead makes only a token charitable
donation—usually $1.50 or less—while keeping the bulk of the "tips" for itself.

4.    Dave also uses its access to consumers' bank accounts to charge a $1
monthly membership subscription fee, frequently without their knowledge or
consent, and regardless of whether Dave has given the consumer a cash advance.
Consumers who realize that Dave has been charging them and seek to stop the
charges or cancel the subscriptions often find that Dave's mechanisms for doing so
are unavailable or effort-intensive.

## JURISDICTION AND VENUE

5.    This Court has subject matter jurisdiction pursuant to 28 U.S.C.
§§ 1331, 1337(a), 1345, and 1355.

6.    Venue is proper in this District under 28 U.S.C. §§ 1391(b)(1), (b)(2),
(c)(2), and (d), 1395(a), and 15 U.S.C. § 53(b).

## PLAINTIFF

7.    Plaintiff, the United States of America, brings this action for
Defendants' violations of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and
Section 4 of the Restore Online Shoppers' Confidence Act ("ROSCA"), 15 U.S.C.
§ 8403. For these violations, the United States seeks relief, including a permanent
injunction, monetary relief, civil penalties, and other relief, pursuant to Sections
5(m)(1)(A), 13(b), and 19 of the FTC Act, 15 U.S.C. §§ 45(m)(1)(A), 53(b), and
57b, and ROSCA, 15 U.S.C. § 8404.

8.    The United States brings this action upon notification and referral
from the FTC, pursuant to Section 16(a)(1) of the FTC Act, 15 U.S.C. § 56(a)(1).
The FTC is an agency of the United States Government created by the FTC Act.

On November 5, 2024, the FTC as plaintiff filed the original complaint in this action, without a demand for civil penalties, against Dave, Inc., only.  The FTC subsequently referred to the Department of Justice an amended complaint alleging ROSCA violations and seeking civil penalties.  The Department of Justice has accepted the referral and hereby files this Amended Complaint, which adds Jason Wilk as a defendant under all counts and demands civil penalties and other appropriate relief.  The Amended Complaint substitutes plaintiff the United States for the FTC as the real party in interest.

## DEFENDANTS

9.      Defendant Dave, Inc., is a Delaware corporation with its principal place of business at 1265 South Cochran Avenue, Los Angeles, California.  Dave transacts or has transacted business in this District and throughout the United States.  At all times relevant to this Amended Complaint, acting alone or in concert with others, Dave has advertised, marketed, distributed, or sold a personal finance mobile app that offers short-term cash advances to consumers throughout the United States.

10.      Defendant Jason Wilk is Dave's co-founder, Chief Executive Officer, President, and Chairman of the Board of Directors.  Wilk has served as Dave's CEO since 2016, and he controls and has a key role in directing numerous decisions for Dave's operations, including the mobile app's digital content and design and how Dave presents itself and its offerings to consumers.  Wilk also holds 60% of the voting power of Dave's executive stock, allowing him to control any matter submitted to shareholders, including but not limited to the election of directors.  At all times relevant to this Amended Complaint, acting alone or in concert with others, Wilk formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Dave, including acts and practices set forth in this Amended Complaint.

11.      Wilk, in connection with the matters alleged in this Complaint,

transacts or has transacted business in this District and throughout the United States.

## COMMERCE

12.    At all times relevant to this Amended Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' BUSINESS ACTIVITIES

13.    Dave operates a personal finance mobile app available for download through the Apple App Store and Google Play Store. Dave advertises its app as a tool that offers short-term cash advances to cover unexpected emergencies and that avoids the financial penalties (such as overdraft fees) that can attend them. Dave calls its advances "Extra Cash" and says consumers can receive amounts "up to $500." Dave has also promised that there are no "hidden fees."

14.    Dave requires consumers who use its app to provide information about their bank accounts to "link" them to the Dave app. Dave uses its access to consumers' bank accounts to analyze their finances and banking history, and to directly debit consumers' bank accounts to collect on advances and other charges.

### Dave Deceptively Advertises "Instant" Cash Advances of "Up to $500" with "No Hidden Fees"

15.    Dave advertises its app to consumers through multiple channels, including online and through social media. Its advertising claims that consumers can obtain cash advances of up to $500 whenever they need them. That amount has increased over time; in earlier periods, Dave advertised advances of up to $75, $100, and $250. Dave's ads emphasize that consumers can receive cash "instantly," "on the spot," "now," and "in under 5 minutes," telling consumers that "[a]ll you have to do is download this app," and that they will pay "no interest" and "no hidden fees." Dave reinforces these claims in the Apple App and Google Play Stores, where consumers download the app, and on the app itself, during the

process of enrolling with Dave.

16.    In reality, only a miniscule number of the consumers who respond to Dave's advertising by downloading the app are offered cash advances in amounts anywhere close to the amounts advertised, and many are not offered any cash advance at all.  And the advance is not "instant" as promised:  those consumers who are offered an advance must pay an "Express Fee" of $3 to $25 to avoid a delay of two to three business days in receiving the funds.

<em>Misrepresentations Online and in Social Media</em>

17.    Since at least 2020, Dave has advertised its cash advance product on social media platforms such as Facebook, Instagram, and TikTok.  Dave's new users frequently find the app through an ad.  Dave's ads expressly and prominently tell consumers that they will be able to receive cash advances of up to $500, "instantly," or "in under 5 minutes," if they download the Dave app.  Examples of these ads appear below.



Advertisement 1



Advertisement 2

 

Advertisement 3                    Advertisement 4

Dave's ads emphasize that consumers can get up to $500 immediately after downloading the app.  Dave's video ads often feature fictitious scenarios in which a stuffed bear representing Dave appears before an actor facing a difficult financial situation and, often through a zap of green lightning, appears to transfer $500 to the actor's smartphone.  Phrases like "Tap for up to $500," "Get up to $500 on the spot," "instantly," and "Get cash now" appear onscreen throughout a typical ad of this type.  A voiceover in these ads typically states, "Download Dave and get up to $500 instantly.  No interest.  No credit check."

    18.    Dave's ads have contained similar messages for years.  When the maximum amount Dave offered was $75 and later $100, Dave's ads told consumers Dave could "instantly send [them] up to $75.  Just pay it back in 10 days."  And that "All [they] need to do is download this app" to receive up to the

maximum amount "in 90 seconds." Examples of these ads appear below.

  

Advertisement 5                    Advertisement 6

19.    Many of Dave's ads promoting instant cash show screens from the user experience inviting consumers to select an amount up to $500. Examples of these ads appear below.




Advertisement 7                    Advertisement 8

20.     Other Dave advertisements depict fictitious scenarios in which actors are shown learning about the Dave app and immediately receiving $500. In one ad, for example, an actor is shown at a gas pump, unable to afford gas for his car. A stuffed bear appears, holding a phone that prominently shows "$500" on its screen. The bear introduces himself as "Dave" and explains that it can get the actor "up to $500 of your future money, now." The actor asks, "$500? Instantly?" The bear confirms: "instantly." When the actor looks at his phone, the screen reads, "Your $500 is on its way." A voiceover in ads states, "Download Dave and get up to $500 instantly. No interest. No credit check."

21.     In another video ad, a stuffed bear sits silently under two lines of text that read "Get up to $500 instantly" and "Download Dave now." Next, a door falls off a cabinet in the background. The bear then says, "Expect the unexpected. Download Dave. Get up to $500 instantly, when you need it most." The next screen contains a smartphone prominently displaying the text "$500," the Dave logo, and the text "Get your future money now. No interest. No credit check."

22.    In fact, only a tiny percentage of Dave users are offered—much less receive—the promised $500 cash advance. Even after the FTC filed the original Complaint in this lawsuit on November 5, 2024, Dave has continued to misrepresent the cash advances it offers customers.  For example, Dave's website has prominently displayed the statement "Get up to $500 in 5 minutes or less," which since this lawsuit was initially filed has been accompanied by a fine-print footnote at the end of the page which says that "the average advance is $170" and that rather than the actual receipt of funds, "[e]nrollment and initial qualification [are] typically completed in 5 minutes."  Even if consumers who visit Dave's website were to locate and read this inconspicuous footnote, it still would not disclose key information about Dave's fees or the fact that many consumers who give Dave access to their bank account will not be offered any advance at all.

*Misrepresentations in the Enrollment Process*

23.    Dave's app store content repeats and reinforces Dave's advertising claims that consumers are just moments away from receiving "up to $500" if they download the Dave app.  Once consumers download the app, Dave emphasizes these claims again in the enrollment process through which Dave obtains access to consumers' bank accounts by having them "link" their accounts to the app.

24.    Consumers can download the Dave app to their smartphones through the Apple App Store or the Google Play Store.  In the Google Play Store, for example, a search for Dave's app will pull up a listing that invites consumers to "Advance up to 500 dollars."  A consumer who swipes through the app listing's carousel of advertising screens will again see the claim that consumers can receive "up to $500 in 5 minutes or less."  Similar content appears in the Apple App Store.

25.    After consumers download and open the Dave app on their smartphones, consumers again encounter screens promoting instant advances of up to $500.  For example, Dave has presented consumers with a welcome screen that tells them, "Get up to $500 when you need it*" and shows a smartphone screen

-10-

displaying an available balance of $500.  This screen includes a large, prominent green button that invites consumers to "Sign up for Dave."  An example of this screen follows:





App Screenshot 1

26.    The app ushers consumers through a series of enrollment screens in which consumers must, among other things, create a sign-in ID using their email address and enter their name and phone number.  Dave then presents many consumers with a prompt—"What can we help you with today?"—for which one of the responses is "Accessing up to $500."  A consumer who selects that option is taken to a screen which states, "Get an ExtraCash advance up to $500*."  An example of this screen follows:



App Screenshot 2

27.     Dave also prompts app users to provide their bank account information.  In the example screen shown above, a prominent green button at the bottom of the screen invites consumers to "Get started."  After a consumer taps "Get started," Dave has displayed a screen headed "Connect your primary bank," with a bright green button at the bottom labeled "Connect account":[1]

_____

[1] In the spring of 2024, while aware of the FTC's investigation, Dave changed the button on the screen headed "Connect your primary bank" to "Agree and continue" and made other minor changes to this screen.



App Screenshot 3

28.    Dave's user interface draws consumers' attention toward continuing with Dave's services, and away from the terms of those services, including by using design elements such as placement, color, text size, and action buttons to guide the consumer through the app. In the above image of a screen from Dave's app, for example, attention is drawn to the bright action button "connect account," while many consumers easily overlook the small, light-colored font text above it.

29.    Even in instances where Dave accompanies its promotional claims with footnotes or additional text behind links, consumers who actually locate and review the inconspicuous text still are not informed of key information. For example, if consumers were to tap on and review the content hidden behind either the "See terms" link on the screen depicted above headed "Get up to $500 when you need it*" or on the "See how ExtraCash works" link on the screen depicted above headed "Get an ExtraCash advance up to $500*," they would not be shown

any of the following information:  (i) that Dave offers cash advances at or near the amounts advertised to very few consumers with some being offered no advance; (ii) that consumers cannot obtain cash advances without waiting two to three business days unless they pay an additional fee, and the details of that fee; (iii) the steps consumers must take to avoid being subject to an additional charge that Dave refers to as a "tip"; and (iv) that Dave will charge an automatically recurring membership subscription fee which is difficult to cancel. Dave does not clearly and conspicuously disclose that information to consumers.

30.    Dave solicits information about consumers' bank accounts to "link" the accounts to Dave.  When a consumer is shown the screen with the heading "Connect your primary bank" and presses the green "Connect account" button, Dave collects the bank account information immediately. Dave uses this information to make decisions about how much (if any) to advance the consumer, frequently deciding not to offer a cash advance.  Dave further uses its access to consumer bank accounts to collect on advances and take other charges directly from consumers' bank accounts.

31.    After a consumer grants Dave access to their bank account and completes the enrollment process, Dave determines whether it will offer the consumer an advance, and the Dave app shows the consumer different screens depending on that determination.  But regardless of whether Dave offers or declines to offer an advance to the consumer when they first complete the enrollment process, Dave continues to represent to enrolled app users—both through the app and through other channels like emails it sends such users—that they can return to the app to get cash advances of "up to $500."  Each time the consumer later uses the app and accesses either the home screen or the "Extra Cash" section of the app, Dave makes a fresh determination of whether to offer the consumer an advance.  If Dave does offer the consumer an advance, it displays the advance amount on the screen.

**Dave Actually Offers Far Less in Cash Advances Than Advertised
and Charges Multiple Undisclosed Fees**

32.     After enrolling, the overwhelming majority of consumers discover
that Dave either will not offer them a cash advance at all, or will only offer them
advances that are much smaller than advertised.

33.     Making matters worse, despite claiming "no hidden fees," Dave
charges consumers at least three types of fees that it does not clearly and
conspicuously disclose before it obtains access to their bank accounts:

   a.   an "Express Fee" of $3 to $25 to obtain an advance instantly, as
        advertised, instead of two to three business days later;

   b.   an additional charge—imposed in many instances without the
        consumer's knowledge or consent—that Dave refers to as a
        "tip" and falsely claims will cause it to donate a specific
        number of meals to feed hungry children; and

   c.   a $1 monthly membership fee, also frequently imposed without
        consumers' knowledge or consent, because Dave's disclosure
        of it is designed to be easily overlooked.

*Dave Provides Far Less Than the Advertised Cash Advance*

34.     Despite Dave's numerous prominent claims that consumers will
receive cash advances of up to $500, few customers are offered anything close to
that, if Dave offers them anything at all.  For example, in the first 14 months after
Dave began advertising advances of up to $500, Dave offered new users a $500
advance only 0.002% of the time:  a rate of less than 1 in 45,000.  To other new
users, Dave did not offer an amount even close to the amount advertised – only
0.13%, or a rate of less than 1 in 750, were offered even half of the advertised
$500.  When Dave did offer an advance, its most common offer was $25.

35.     More than three-quarters of the time, Dave did not offer first-time
customers any advance at all.  In fact, on average more than 40% of new users

were unable to obtain even a single offer of a cash advance from Dave in a calendar month. Of those new users who did receive advance offers, about 0.009% of those offers—or less than 1 in 10,000—were for $500 and only 0.56%, or about 1 in 175, were for at least $250.

36.    Repeat Dave users also receive offers that are much less than advertised. In the first 14 months after Dave began advertising advances of up to $500, on average, more than a third of existing (not "new") Dave users were not offered a cash advance at all in a calendar month. When determining whether and in what amount to offer an advance to an existing user, Dave offered a $500 advance less than 1% of the time.

37.    Neither Dave's ads nor its app store content inform consumers that very few consumers receive cash advances for the advertised $500. Other than prominent representations such as "Get up to $500," the only references to the amount of consumers' advances in Dave's advertising or app store listings typically are in small print, are buried in block text, use vague or confusing language, and/or are found in obscure locations.

38.    Many consumers believe Dave's claims that they will get up to $500 upon enrolling. One consumer reported that Dave "[c]laims you can borrow up to 500.00 dollars. But, I only was able to get 25.00. Not very helpful." Another consumer wrote that they "have not been able to do any advances at all[;] my advance amount stays at zero but yet I get emails daily with lies that they do $500 advances[;] just a scam in my opinion." Yet another consumer complained that Dave's advertising was "[m]isleading. . . . you're not guaranteed $400 or $500."

39.    Many consumers make clear that they would not have signed up for Dave if they had known Dave would offer far less than promised. One consumer tried to cancel because "[d]espite making decent money, they wouldn't loan me more than $5." Another consumer complained they "got 2 small cash advances and paid them OFF ON TIME. They kept promising 500 for the past month and

NEVER delivered. I Uninstalled this useless app from this useless company." Yet another consumer said "I downloaded Dave because I needed some money[;] they say u can get up to 500 well they only allowed me 25 . . . to me it was just a waste of my time. . . . I paid them back and will be deleting this account." Still another consumer reported, "Every time you'll tell me you're going to give me $500[] Advance I put in my bank Information . . . . And then you never do it. . . . Stop with the lies."

40.     Internal documents reflect that consumers believe they will be offered Dave's advertised advance amounts and are surprised to receive less.  A Dave internal analysis of customer service data found that "Low advance amount," "Low advance limits and approval," and "Advance request denied" were among the top "drivers" of consumer contacts with customer service.  Similarly, a Dave internal survey found that "Not enough money" was a top source of dissatisfaction for all Dave users, new and old.  Jason Wilk received and reviewed many consumer complaints and internal Dave analyses showing the consumer dissatisfaction arising from Dave's deceptive representations.

41.     Thousands of consumers contact Dave each month to cancel their accounts because the offered advance amounts are smaller than promised or because Dave offers them nothing.  Multiple analyses Dave has performed on its customer service data have found that of customers who reach out to cancel their accounts, "most don't qualify for an advance or get a smaller than expected advance."

*Dave Charges an Undisclosed Fee to Get Cash Advances "Instantly," as Advertised*

42.     Although Dave prominently advertises that consumers will receive funds "instantly," "on the spot," "now," and "in under 5 minutes," Dave in fact requires consumers to wait two to three business days before receiving their advance unless they pay Dave an "Express Fee" of $3 to $25.

43.     Consumers find out that they must pay an "Express Fee" to avoid waiting several days to receive their advance only after they give Dave access to their bank accounts and try to collect an offered advance.  An internal Dave presentation received by Wilk and others at the company noted in a discussion of the screen that demands an Express Fee in order to receive "money now," that "[w]hat we promised [to consumers] is not what they see."  The presentation recommends that Dave should "[s]et expectations much earlier on the true cost of the money [consumers] are borrowing."  Defendants did not adopt that recommendation.

44.     Instead, prior to collecting bank account information and offering a cash advance, Dave presents a consumer with, at most, only a vague statement on this topic.  For example, the screen headed "Connect your primary bank," pictured in Paragraph 27 above, contains in text that is smaller and fainter than either the screen's bold-print heading or the large green button labeled "Connect account," the statement "Get money instantly for a small fee."  This statement does not inform consumers that, if they do not pay the unspecified "small fee," Dave will require them to wait two to three business days before receiving their advanced funds.  This statement also does not inform consumers of the amount of the fee, which often ranges between $3 and $25.

45.     Similarly, neither Dave's ads nor its app store content inform consumers that consumers must pay this Express Fee to receive their advance quickly, as advertised, rather than wait several days.  While Dave prominently represents that consumers will receive funds "instantly," "on the spot," "now," and "in under 5 minutes," Dave's only references to Express Fees in its advertising or at the app stores typically appear in small print, are buried in block text, use vague or confusing language, and/or are found in obscure locations, and do not state that unless consumers pay an Express Fee, Dave will require them to wait two to three business days before receiving their advance.

*Defendants Deceive Consumers About Whether They Are Being Charged for a "Tip" and Whether the Charge Is Avoidable*

46.     After accepting an advance offered by Dave and selecting a transfer method, Dave typically presents consumers with a screen that it uses to charge them a "tip."  Dave does not make clear to consumers that they are agreeing to this additional charge or that they have any way to avoid agreeing to it.  An example of this screen is below, headed "Your advance is on its way!":



App Screenshot 4

47.     A large green button labeled "Thank you!" appears at the bottom of the screen.  Dave charges consumers who simply tap the "Thank you!" button an extra 15% of their advance.  Dave calls this charge a "tip," and it is an important revenue source for Dave.  Indeed, "tipping" was implemented by Wilk for the purpose of generating additional revenue from consumers, and Wilk controls the

design of "tipping" in the app.  As Wilk knows, many consumers who tap the "Thank you!" button are surprised to later learn that Dave has charged them an extra 15% of their advance.  Dave does not mention the charge in its advertising, and consumers who open the Dave app for the first time and proceed directly to attempt to take an advance do not encounter any mention of this charge, or how to avoid being subject to it, before granting Dave access to their bank accounts.

48.    Many consumers did not realize they were paying the extra charge that Dave calls a "tip."  Many others understood this extra charge to be an unavoidable part of Dave's advance process.  Consumer complaints include the following:

a.    "They will add a tip without your knowledge."

b.    "[I]t forces you to tip."

c.    "[M]akes you tip them . . . ."

d.    "[I]t does not give me an option to not leave a tip."

e.    "Don't hit 'thank you' on tip screen, you'll see many ppl say this.  It counts as agreeing to high tip & IS SNEAKY."

f.    "The interface is set up to trick you into giving the tip. . . .  I feel cheated/scammed by this whole process."

g.    "[T]hey make you give a tip when you don't want to give one . . . ."

h.    "App is very deceptive and impossible to get help.  It asks for a 'tip' when you get an advance, and it's not obvious or clear how NOT to tip."

i.    "Deceptive, riddled with fees and default 15% tip.  This app is toxic and exploiting those who want honest financial products.  Shame on you."

j.    "Absolute awful app, tricks you into giving them a tip whenever you advance money.  DO NOT USE!!!!"

49.    Internal Dave documents acknowledge both that Dave charges consumers for "tips" without their awareness and that Dave's interface leads consumers to believe that such charges are unavoidable.  For example, an internal analysis of customer service data states that "[m]embers are still unaware they left a tip when they advance" and that consumers are "upset" about these charges.  The analysis notes that consumers are "having a hard time" avoiding being charged Dave's preset "tip" of 15% and recommends that Dave "provide better visibility" about how to avoid the charge.  Defendants did not implement the recommendation to make clear to consumers how to avoid the charge.

50.    An internal Dave presentation describes these screens as a "[d]ark" user interface and states that "selecting custom tip is unnoticeable and some didn't know this was possible."  The presentation recommends that Dave "[m]ake sure to have the option to not tip be clear."  Defendants did not implement this recommendation to create a clear option for consumers to avoid the charge for a "tip."

51.    An internal Dave study found that "Didn't want to pay tip" was one of the top sources of Dave user dissatisfaction.  Another internal Dave document lists "[n]o clear option to not tip" as a "Pain-Point[]" for consumers.  The document also recommends, as the top of a list of "Future Initiatives," adding a "[n]o tip button."  Defendants did not add this button.

52.    In an online chat between two Dave employees who collected and examined app store reviews that mention "tipping," one commented that "customers do not understand on how to edit their "tip" amount or how to add no tip and this is the biggest customer pain."  The other agreed, adding that app reviews state that Dave "do[es]n't give you a chance not to tip."  The second Dave employee also observed that "[p]eople expect an obvious 'no tip' button."  The employee described Dave's interface as a "dark pattern" that had been criticized by "designers and members."

53.     Dave users also often find it impossible to change their "tip" amount after pressing the "Thank you" button or entering a custom "tip." There is no easy mechanism to "update" the "tip" amount in the app, and under Dave's terms and conditions, users are told that they are "will be unable to update [their] tip in the app if the settlement has started."

*Defendants Deceptively Represent That the "Tip" is a Charitable Contribution and Will Pay for a Specified Number of Meals*

54.     In addition to deceiving consumers about whether they are being charged and whether the charge is required, Dave deceptively represents that, based on the consumer's payment of a charge that Defendants refer to as a "tip," Dave will pay for or donate a specified number of "healthy meals" for children in need.

55.     Below is an example image of a screen through which Dave has made these deceptive representations.  On this screen, the content between the bold-print "Your advance is on its way!" heading and the large green "Thank you!" button features colorful images of a smiling cartoon child holding a spoon who is surrounded by various food items:



App Screenshot 5

56.     Beneath the images of the child and nine food items are three boxes labeled "10 Healthy Meals," "15 Healthy Meals," and "20 Healthy Meals."  If the consumer taps on "20 Healthy Meals," the number of food items around the child increases to twelve.  If the consumer taps on "10 Healthy Meals," the number of food items around the child drops.

57.     Many consumers tap the prominent green "Thank you!" button on this screen.  Dave charges these consumers between 10% and 20% of their advance amount.

58.     To avoid paying a "tip," consumers must figure out that they need to tap the "Leave a custom tip" button, which is about half as long as the "Thank you!" button and—unlike the "Thank you!" button, which is colored green against a white background—is colored white against a white background.  If consumers tap this button, the three labeled boxes are replaced with a horizontal "slider."

Initially, above the slider in large, bold-print text appear the words "15 Healthy Meals" and an image of the cartoon child holding a spoon and surrounded by ten food items.

59.     If the consumer moves the slider to the right, the number of "Healthy Meals" displayed increases incrementally up to 25. As the count of "Healthy Meals" increases, more food items appear around the cartoon child, with twenty-five items filling the screen when the count of "Healthy Meals" reaches 25:



App Screenshot 6

60.     If the consumer moves the slider to the left, the number of "Healthy Meals" displayed decreases incrementally down to 0. As the slider moves to the left and the count of "Healthy Meals" decreases, food items disappear from around the child. If the count of "Healthy Meals" reaches 2, the only items around the child are bread and water.

61.     To avoid paying any tip, the consumer must move the slider fully to the left to reduce the count of "Healthy Meals" to zero. The slider then turns from

-24-

green to red, the text of the large green button at the bottom of the screen changes from "Thank you!" to "No tip," and the image of the child is replaced by an image of an empty plate with a fork and spoon.

62.    The combination of the prominent imagery of multiple food items surrounding the cartoon child and the bold-print language about the provision of 10, 15, or 20 "Healthy Meals" leads consumers to believe that, if the consumer permits Dave to charge a large "tip," Defendants will donate that money to charity or pay for or donate a specified number of meals to children in need, based on the size of the "tip."

63.    Defendants further misrepresent their use of the "tips" elsewhere, including on their website.  For example, "frequently asked questions" material on Dave's website poses the question "What are tips and who do they benefit?" Defendants' answer states that "Dave has partnered with" a "hunger-relief organization to maximize your impact."  It continues to claim, "This year, Dave is working to provide at least $250,000" for the charity's "network of food banks serving every county in America. . . . Your contribution will help feed 44 million people including more than 13 million children facing hunger in the U.S." Defendants' answer does not mention that they themselves benefit from "tips."

64.    In truth, Dave does not pay for or donate a specified number of meals to children in need based on its user "tips."  Instead, for each percentage point of a "tip" charged to a consumer, Dave donates only 10 cents and keeps the rest.  For example, in App Screenshot 5 above, if the consumer were to tap the "Thank you!" button, Dave would not pay for or donate "15 Healthy Meals" as stated in bold print surrounded by images of numerous food items, but would instead donate only $1.50 to a hunger relief organization: far less than it would cost to buy 15 meals or to purchase and prepare the food for 15 meals.

65.    Dave internal documents acknowledge this "Healthy Meals" screen content is misleading.  For example, a Dave executive described the "Healthy

Meals" content of these screens to Wilk as involving a "dark / guilt inducing design pattern" that helps drive revenue. Similarly, two Dave executives discussed this interface as a "dark pattern." The two agreed that the "hungry child def[initely] leaves us open for criticism" and exhibits "very questionable design decisions." An internal document further notes that the "Healthy Meals" content of Dave's interface "has been called out by industry advocates and media publications as manipulative and misleading." Despite this, Defendants continue to subject Dave users to the "Healthy Meals" content.

66.    Defendants' deceptive "Healthy Meals" content succeeds in affecting consumer behavior. Dave ran an experiment in which some consumers used a version of the app's interface that did not include the "Healthy Meals" content. Without this content, the percentage of new users who were charged for a "tip" dropped by about a third and overall "tip" revenue dropped by almost a quarter. A Dave internal analysis found that, although Dave allowed only a small minority of its users to encounter versions of the interface that did not involve the "Healthy Meals" content, the experiment nonetheless caused a substantial fall in Dave's monthly revenue. The analysis recommended that Dave immediately resume showing all users the "Healthy Meals" content.

67.    Similarly, Dave ran an experiment in which some users used a version of the interface that did not include the initial screen, shown at Paragraph 55, with three "Healthy Meals" boxes. Instead, the consumers in this experiment were taken directly to one of several variations of the "slider" screen shown at Paragraph 59. Some variations included Dave's "Healthy Meals" content, while others did not.

68.    A Dave internal analysis of this experiment found that, when the initial screen with the three "Healthy Meals" boxes was eliminated, the number of consumers charged for a "tip" and the amounts of those charges both fell. These numbers fell most dramatically for the variations that also eliminated the "Healthy

Meals" content from the "slider" screen.  A subsequent Dave internal analysis expressed concern about the drop in Dave's revenue resulting from the experimental changes and recommended that Dave resume showing "Healthy Meals" content to all users included within the experiment.

69.   Wilk concluded that Dave's experimentation showed its strategy of presenting "tips" as connected to the provision of healthy meals was important to preserving the company's revenue.  Defendants have continued to present screens with "Healthy Meals" representations to the overwhelming majority of consumers to whom they give cash advances.

*Dave Takes a Monthly Charge from Consumers' Accounts without Clearly and Conspicuously Disclosing the Charge*

70.   Dave charges consumers who connect their bank accounts to its app an automatically recurring monthly fee, without first clearly disclosing that fee or obtaining the consumer's informed consent to it.  Dave does not allow users to get a cash advance without first enrolling in this automatically recurring charge.  Dave continues to charge a consumer this unavoidable fee each month, until the consumer takes affirmative action to cancel it.

71.   As shown in App Screenshot 3, *supra* paragraph 27, immediately before obtaining access to consumers' bank accounts, Dave typically displays a screen headed "Connect your primary bank," with a bright green button at the bottom labeled "Connect account".

72.   Many consumers do not notice small light-colored text over the large green action button that mentions Dave's membership fee and FAQs.  They are then surprised when Dave enrolls all consumers who tap the "Connect account" button in a subscription that automatically renews each month, whether or not they are offered a cash advance.  Dave charges these consumers $1 monthly on a recurring basis unless the consumer takes affirmative action to stop the charge.  As Dave has acknowledged in an internal document, "[p]eople don't know they're

paying [the] $1" subscription fee and it can be "a surprise to members" to discover that Dave has taken $1 each month from their bank accounts.  Similarly, an internal Dave analysis of a customer survey notes that "our members say" that Dave "doesn't tell you it's going to charge a monthly fee when you first sign up . . . ."  Dave's customer service has received, on a monthly basis, hundreds of communications from consumers on the topic "What is the $1 charge?"

73.    Wilk and others at Dave have received complaints from consumers that they did not agree to be charged the membership fee and did not know it existed until after they were charged.  Examples of consumer complaints include the following:

a.    "They charge a $1 a month 'membership fee' which is never disclosed to you once while setting up the account."

b.    "DON'T SIGN UP Unknowingly started charging me $1 a month . . . ."

c.    "They just started charging me a monthly fee with no notice.  Watch any card you have used in this app."

d.    "Huge SCAM.  After signing up and realizing they would loan me $50[,] I used another source.  Then they announced they decided to charge a fee, After the fact.  Without my consent."

e.    "[N]oticed they are charging me a membership fee.  Its only $1 but I didn't know about it and had never taken any loan from them.  Maybe if they had told me upfront I would be opted into their membership system . . . I would have been able to cancel it with no hard feelings after . . . ."

f.    "screw your app I never asked to get charged a subscription fee and then I later got charged for it . . . I never asked to get charged this at all and you otherwise authorized it without my permission"

g.      "Never agreed to a membership, but they used my checking
account information to take a membership fee even when my
debit card was locked.  Very dissatisfied with this."

74.    Such complaints are unsurprising, as consumers who open the Dave
app for the first time and proceed directly to attempt to take an advance only
encounter any mention of the existence of the membership fee on a screen like the
one depicted above headed "Connect your primary bank," where it appears in text
that is smaller, lighter, and/or less prominent than either the heading or the bright
green button labeled "Connect account."

**Dave Fails to Provide Simple Mechanisms for Consumers to Stop the
Recurring Charge**

75.    Dave fails to provide simple mechanisms for consumers to stop the
recurring "membership" charge.  In the words of one consumer, "I've tried leaving,
but they literally will not let me go.  I had to fight with them to delete my account,
and I kept getting charged the membership fee. . . .  LEAVE ME ALONE.  I
HATE DAVE."

76.    Consumers who realize that Dave is charging them every month and
want to stop it have often been unable to find an in-app process to do so, either
because Dave has not provided one, because Dave does not prominently inform
consumers how to stop the charge, or for both reasons.

77.    Dave has failed to provide many of its users with an in-app process
for users to stop the recurring charge.  From at least August 2021 through
November 2022, Dave did not allow *any* consumers to stop the recurring charge
through an in-app process if they had also opened a Dave bank account (which
Dave, beginning in early 2022, required all new consumers to have if they wanted
advances).  And even after November 2022, Dave failed to give many users an in-
app cancellation option.

78.    Additionally, Dave does not prominently inform consumers how to

-29-

stop the recurring charge, including what options exist for stopping the charge,
what rules apply to those options, or where any in-app processes for stopping the
charge can be found.  Instead, consumers are forced to hunt instructions on how to
close their account.  Even consumers who successfully figure it out do not
necessarily succeed in ending their subscriptions, particularly because Dave may
refuse to cancel the subscription unless the consumer's account is settled.

79.    Some consumers are convinced that there is no way to stop the
recurring charge.  For example, consumers have complained that "[t]hey continue
to charge me $1 every single month with no way to opt out" and "[t]here is no way
to unsubscribe and they keep charging me."  An internal Dave analysis of
consumer complaints made to the Better Business Bureau flagged "inability to
cancel easily within the app" as a top driver of complaints, noting that consumers
are "upset that there isn't a self-cure option in-app."

80.    Dave has obscured information about mechanisms for stopping the
recurring charge to such a degree that even Dave managers struggle to understand
and use them.  In an exchange on a messaging platform, two Dave senior managers
discussed the option to temporarily stop the recurring charge by "pausing" an
account, including their uncertainty about what it means to "pause" an account and
whether one of them had been able to successfully find a pause function within the
app.  In part of their exchange, the two attempted to guess why one of them
seemed to be unable to find or use "pause":

"we can't pause if we have a dave spending accou[nt] with money?"

"seems like a weird thing"

"I have no idea"

"lol"

81.    Some consumers who are unable to find an in-app process send a
message to Dave customer service asking to cancel the charge.  Dave does not
simply stop the recurring charge in response to such messages.  Instead, Dave will

do one or more of the following:  (a) point the consumer to an in-app process that may or may not be available for the consumer; (b) deny that Dave customer service has the ability to stop the charge for the consumer; or (c) demand, in order to cancel or "pause" the charge, that the consumer provide multiple points of personal and/or financial account information.  The information demanded by Dave has varied but has included date of birth, phone number used to sign up for Dave, full mailing address, last four digits of the consumer's social security number, and details about the last two transactions on the consumer's external bank account.

82.    Dave has frequently failed to respond to requests to stop the recurring charges.  One consumer warned, "DO NOT DOWNLOAD THIS.  EXTREMELY HARD TO CONTACT ANYONE.  THEY DON'T DELETE YOUR ACCOUNT WHEN ASKED."  Another consumer wrote that "[t]he Dave app won't let me close my account . . . .  I've literally been trying everyday for the last 2 weeks, I have emailed no response, reached out for assistance no help, why won't it let me close it?  . . . They just want to keep me locked in so that can continue to take 1$ a month from me."

83.    Dave's demands for sensitive information from consumers are another roadblock to stopping the charge.  As noted in an internal Dave analysis of consumer complaints made to the Better Business Bureau, consumers who want to stop the charge often abandon these efforts in the face of Dave's demands for sensitive information.  One consumer stated that "[t]hey refuse to cancel my account and just tell me that I need to send more and more sensitive personal information in a sloppy email to someone named 'Ambear.' "  For another consumer who wanted to "pause" her account, it took twenty-seven days, nine messages to customer support, and a threat to contact the Better Business Bureau to get Dave to stop charging her.

84.    Moreover, consumers who do identify Dave's in-app processes for stopping the recurring charge often find that these processes are not simple.  For

-31-

example, Dave requires a consumer starting on the app's main screen to take at least nine separate steps to reach and complete Dave's current in-app cancellation process. In parts of this process, consumers are diverted from cancellation if they select the most prominent option on the screen. Indeed, a Dave executive, in considering a colleague's description of Dave's "account close, cancel" app functionality as a "dark pattern" that is "purposefully confusing and hard," wrote that "I'm sure it's not good (I remember looking at it a long time ago and it was bad)." And an internal Dave analysis of its customers identified "Cancellation" as a driver of negative customer perceptions of Dave's app, noting that "our members say" that it is "[h]ard to cancel."

85.    Beyond all this, in some instances, Dave has denied consumers any mechanism for stopping the recurring charge, let alone simple mechanisms. Specifically, Dave at times has refused to stop the recurring charge when, according to Dave, the consumer has not yet fully repaid an advance. In July 2020, Dave informed its customer service team that consumers who are eligible to pause are those "who *do not* have an open advance or an advance with pending advance payment." And, in the following years, customer service representatives have repeatedly informed consumers that they cannot "pause" or cancel to stop the recurring charge because Dave is claiming that they have an unpaid advance.

86.    Defendants have received consumers' complaints and are aware of the hurdles that consumers face in attempting to cancel, but they have nonetheless chosen not to provide consumers with a simple mechanism to cancel.

87.    Recognizing that it operates in a highly regulated space, Dave purportedly runs a compliance management system to address legal and regulatory scrutiny pursuant to the FTC Act and other laws against unfair and deceptive practices. Defendants are aware of government scrutiny into their business practices. In January 2023, the FTC issued Dave a Civil Investigative Demand that stated the FTC was investigating Dave's potential violations of the FTC Act and

ROSCA in connection with the company's sale and promotion of its cash advance products.  Defendants also had numerous other indications that their practices misled consumers, including the consumer complaints and internal analyses and discussions referenced in this Complaint.  Consumers complained that Dave deceived them, that it was breaking the law, and that it was violating ROSCA. Despite all of this, Defendants chose to continue engaging in and profiting from unfair, deceptive, and unlawful practices, as described in this Complaint.

88.    Based on the facts and violations of law alleged in this Amended Complaint, the United States has reason to believe that Defendants are violating or are about to violate the law because, among other things:

      a.    Defendants have engaged in their unlawful acts and practices repeatedly over a period of years;

      b.    Defendants have earned significant revenues from participating in these unlawful acts and practices;

      c.    Defendants have continued their unlawful acts or practices despite knowledge of numerous consumer complaints and related government investigation and enforcement action; and

      d.    Defendants have an incentive to continue to engage in violations and retain the means and ability to do so.

## VIOLATIONS OF THE FTC ACT

89.    Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

90.    Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

## Count I:  Misrepresentations Regarding Cash Advances

91.    Paragraphs 1 through 90 are incorporated as if set forth herein.

92.    In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of its cash advance services, Defendants

-33-

represent and have represented, directly or indirectly, expressly or by implication, that the consumer can obtain a cash advance of up to an advertised amount, and that consumers will receive cash advances instantly or within a matter of minutes without being charged any hidden fees.

93.    Defendants' representations as described above are false or misleading or were not substantiated at the time the representations were made.

94.    Therefore, Defendants' representations as described above constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**Count II:  Misrepresentations Regarding "Tipping" Charges**

95.    Paragraphs 1 through 94 are incorporated as if set forth herein.

96.    In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of its cash advance services, Defendants represent, directly or indirectly, expressly or by implication, that

      a.    making a selection such as tapping the "Thank you!" button on a screen headed "Your advance is on the way!" merely concludes the transaction;

      b.    the charge that Defendants refer to as a "tip" is unavoidable; and

      c.    based on the consumer's payment of a charge that Defendants refers to as a "tip," Defendants will pay for or donate a specified number of meals for children in need.

97.    Defendants' representations as described above are false or misleading or were not substantiated at the time the representations were made.

98.    Therefore, Defendants' representations as described above constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## VIOLATIONS OF THE
## RESTORE ONLINE SHOPPERS' CONFIDENCE ACT

99.    In 2010, Congress passed the Restore Online Shoppers' Confidence Act, 15 U.S.C. §§ 8401 *et seq.*, which became effective on December 29, 2010. Congress passed ROSCA because "[c]onsumer confidence is essential to the growth of online commerce.  To continue its development as a marketplace, the Internet must provide consumers with clear, accurate information and give sellers an opportunity to fairly compete with one another for consumers' business." Section 2 of ROSCA, 15 U.S.C. § 8401.

100.    Section 4 of ROSCA, 15 U.S.C. § 8403, generally prohibits charging consumers for goods or services sold in transactions effected on the Internet through a negative option feature, as that term is defined in the Commission's Telemarketing Sales Rule ("TSR"), 16 C.F.R. § 310.2(w), unless the seller (1) clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information, (2) obtains the consumer's express informed consent before making the charge, and (3) provides a simple mechanism to stop recurring charges. 15 U.S.C. § 8403.

101.    The TSR defines a negative option feature as a provision in an offer or agreement to sell or provide any goods or services "under which the customer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer." 16 C.F.R. § 310.2(w).

102.    Defendants sell Dave memberships as described above, through a negative option feature as defined by the TSR. 16 C.F.R. § 310.2(w).  Dave automatically charges a consumer monthly membership fees and charges the consumer's bank account for those fees until the consumer affirmatively acts to cancel his or her membership.

103.    Pursuant to Section 5 of ROSCA, 15 U.S.C. § 8404, and

Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of ROSCA constitutes an unfair or deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

104.    Defendants' violations are willful and knowing.

**Count III:  Failure to Provide Clear and Conspicuous Disclosures**

105.    Paragraphs 1 through 104 are incorporated as if set forth herein.

106.    In numerous instances, in connection with charging consumers for goods or services sold in transactions effected on the Internet through a negative option feature, as described above, Defendants have failed to clearly and conspicuously disclose before obtaining consumers' billing information all material transaction terms, including the following:

   a.    that Defendants offer cash advances at or near the amounts advertised to very few consumers, and do not offer any cash advances to some customers;

   b.    that consumers cannot obtain cash advances without waiting two to three business days unless they pay an additional fee, and the details of that fee;

   c.    that Defendants charge consumers an additional fee that they refer to as a "tip," and the steps consumers must take to avoid being charged; and

   d.    that Defendants charge consumers a recurring membership subscription fee that will automatically recur until the consumer takes action to cancel it, and details about how the consumer can cancel.

107.    Therefore, Defendants' acts or practices described above violate Section 4 of ROSCA, 15 U.S.C. § 8403, and Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

108.    Defendants have engaged in these unlawful acts knowingly, with knowledge of applicable regulations and with knowledge of numerous consumer

complaints.

### Count IV:  Failure to Obtain Express Informed Consent

109.    Paragraphs 1 through 108 are incorporated as if set forth herein.

110.    In numerous instances, in connection with charging consumers for goods or services sold in transactions effected on the Internet through a negative option feature, Defendants have failed to obtain a consumer's express informed consent before charging the consumer's credit card, debit card, bank account, or other financial account for products or services through such transaction.

111.    Therefore, Defendants' acts or practices described above violate Section 4 of ROSCA, 15 U.S.C. § 8403, and Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

112.    Defendants have engaged in these unlawful acts knowingly, with knowledge of applicable regulations and with knowledge of numerous consumer complaints.

### Count V:  Failure to Provide Simple Mechanisms to Stop Recurring Charges

113.    Paragraphs 1 through 112 are incorporated as if set forth herein.

114.    In numerous instances, in connection with charging consumers for goods or services sold in transactions effected on the Internet through a negative option feature, as described above, Defendants have failed to provide simple mechanisms for a consumer to stop recurring charges from being placed on the consumer's credit card, debit card, bank account, or other financial account.

115.    Therefore, Defendants' acts or practices violate Section 4 of ROSCA, 15 U.S.C. § 8403, and Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

116.    Defendants have engaged in these unlawful acts knowingly, with knowledge of applicable regulations and with knowledge of numerous consumer complaints.

### CONSUMER INJURY

117.    Consumers are suffering, have suffered, and will continue to suffer

substantial injury as a result of Defendant's violations of the FTC Act and ROSCA. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers and harm the public interest.

## CIVIL PENALTIES

118.  Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A), authorizes this Court to award civil penalties for each violation of ROSCA.

119.  Defendants violated ROSCA with actual knowledge or knowledge fairly implied on the basis of objective circumstances, as required by Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A).

## PRAYER FOR RELIEF

120.  Wherefore, Plaintiff requests that the Court:

A.  Enter a permanent injunction to prevent future violations of the FTC Act and ROSCA;

B.  Award monetary and other relief within the Court's power to grant;

C.  Impose civil penalties for each violation of ROSCA; and

D.  Award any additional relief as the Court determines to be just and proper.

Dated: _____            Respectfully submitted,

**FOR THE UNITED STATES OF AMERICA:**

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General, Civil Division

BURDEN H. WALKER
Deputy Assistant Attorney General

1

2    AMANDA N. LISKAMM
     Director
3    Consumer Protection Branch

4    LISA K. HSIAO
5    Senior Deputy Director, Civil
     Litigation
6

7    ZACHARY A. DIETERT
     Assistant Director
8

9

10   /s Sean Saper
     SARAH WILLIAMS
11   Senior Trial Attorney
12   SEAN Z. SAPER
     JOHN F. SCHIFALACQUA
13   Trial Attorneys
14   Consumer Protection Branch
     U.S. Department of Justice
15   P.O. Box 386
16   Washington, DC 20044
     Phone: 202-616-4269 (Williams)
17   202-742-7116 (Saper)
18   202-598-8153 (Schifalacqua)
19   Email: sarah.williams@usdoj.gov
     sean.z.saper@usdoj.gov
20   john.f.schifalacqua@usdoj.gov

21

22

23   OF COUNSEL, FOR THE FEDERAL TRADE COMMISSION:

24   DANIEL O. HANKS (pro hac vice pending)
25   dhanks@ftc.gov; 202-326-2472
     JASON SANDERS (pro hac vice pending)
26   jsanders1@ftc.gov; 202-326-2357
27   JULIA E. HEALD (pro hac vice)
     jheald@ftc.gov; 202-326-3589
28

Federal Trade Commission
600 Pennsylvania Ave NW
Washington, DC  20580

DAVID HANKIN, SBN 319825
dhankin@ftc.gov; 202-227-1521
Federal Trade Commission
10990 Wilshire Blvd., Suite 400
Los Angeles, CA 90024