YAAKOV M. ROTH
Acting Assistant Attorney General, Civil Division
MICHAEL D. GRANSTON
Deputy Assistant Attorney General, Civil Division
AMANDA N. LISKAMM
Director, Consumer Protection Branch
LISA K. HSIAO
Senior Deputy Director, Civil Litigation
ZACHARY A. DIETERT
Assistant Director
SARAH WILLIAMS
Senior Trial Attorney
SEAN Z. SAPER
JOHN F. SCHIFALACQUA
Trial Attorneys
Consumer Protection Branch
Civil Division, United States Department of Justice
450 5th Street, NW, Suite 6400-South
Washington, D.C. 20001
Phone: (202) 616-4269
sarah.williams@usdoj.gov
*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>DAVE INC., a Delaware corporation, and JASON WILK, an individual,<br><br>Defendants. | **Case No. 2:24-cv-09566-MRA-AGR**<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**<br><br>**ORAL ARGUMENT NOTICED**<br><br>Date:  May 5, 2025<br>Time: 1:30 p.m.<br>Place: 10B<br>Judge: Mónica Ramírez Almadani |

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................... 1

CONDUCT ALLEGED IN THE COMPLAINT ....................................... 1

STANDARD OF REVIEW .............................................................................. 5

I.    Rule 12(b)(6) Focuses on the Complaint to Determine Its Legal
      Sufficiency ................................................................................................ 6

II.   The Complaint Is Not Subject to Federal Rule of Civil Procedure 9(b)'s
      Heightened Pleading Standard. ........................................................... 6

ARGUMENT ...................................................................................................... 8

I.    The Complaint States Claims Under Section 5(a) of the FTC Act for
      Misrepresentations About Cash Advances and "Tips" ..................... 9

      1.    Count I States a Deceptive Practices Claim for Creating the Misleading
            Impression that Consumers Would Receive Cash Advances of Up To
            $500 Instantly and Without Hidden Fees .................................. 11

      2.    Count II States a Deceptive Practices Claim Regarding "Tipping." .... 14

II.   The Complaint States Three Claims Under ROSCA for Lacking Clear and
      Conspicuous Disclosures, Express Informed Consent and a Simple
      Mechanism to Stop Charges. ............................................................... 17

      1.    Count III States a ROSCA Claim For Failure to Clearly and
            Conspicuously Disclose Multiple Material Terms. ............................. 19

      2.    Count IV States a ROSCA Claim For Failure to Obtain Express
            Informed Consent. ..................................................................... 23

      3.    Count V States a ROSCA Claim for Failure to Provide a Simple
            Mechanism to Stop Recurring Charges. ....................................... 24

      4.    Counts III, IV and V Provide a Legal Basis for Civil Penalties ............ 26

III.  Jason Wilk Faces Individual Liability for the Unlawful Activities Alleged in
      the Complaint ........................................................................................ 27

IV.   The Amended Complaint is Procedurally Proper. ........................... 31

V.    Defendants' Request for Judicial Notice is Impermissible ............. 33

CONCLUSION ................................................................................................. 33

# TABLE OF AUTHORITIES

## Cases

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ........................................................................... 6

*Berman v. Freedom Fin. Network, LLC,*
30 F.4th 849 (9th Cir. 2022) ......................................................... 23

*Davis v. HSBC Bank Nevada, N.A.,*
691 F.3d 1152 (9th Cir. 2012) ....................................................... 10

*FTC v. Am. Fin. Benefits Ctr.,*
324 F. Supp. 3d 1067 (N.D. Cal. 2018) ................................. 10, 27

*FTC v. Amazon.com, Inc.,*
735 F. Supp. 3d 1297 (W.D. Wash. 2024) ......................... passim

*FTC v. Cardiff,*
2019 WL 9143561 (C.D. Cal. May 16, 2019) .......................... 24

*FTC v. Com. Planet, Inc.,*
2010 WL 11673796 (C.D. Cal. Feb. 12, 2010) ....................... 28

*FTC v. Credit Bureau Ctr., LLC,*
2021 WL 4146884 (N.D. Ill. Sept. 13, 2021) ......................... 28

*FTC v. Cyberspace.com LLC,*
453 F.3d 1196 (9th Cir. 2006) ................................................ passim

*FTC v. Dinamica Financiera LLC,*
2010 WL 9488821 (C.D. Cal. Aug. 19, 2010) ....................... 28

*FTC v. Doxo, Inc.,*
2025 WL 887311 (W.D. Wash., March 21, 2025) ............ 9, 18, 20

*FTC v. FleetCor Techs., Inc.,*
620 F. Supp. 3d 1268 (N.D. Ga. 2022) .................................. 12

*FTC v. Freecom Commc'ns, Inc.,*
401 F.3d 1192 (10th Cir. 2005) ................................................... 7

*FTC v. Frontier Comm. Corp.,*
2021 WL 6540379 (C.D. Cal., Oct. 3, 2021) ......................... 12

*FTC v. Grand Canyon Educ., Inc.,*
745 F. Supp. 3d 803 (D. Ariz. 2024) ......................................... 7

*FTC v. Health Formulas, LLC,*
2015 WL 2130504 (D. Nev. May 6, 2015) ......................... 21, 23

*FTC v. Medicor LLC*,
217 F. Supp. 2d 1048 (C.D. Cal. 2002)........................................................ 12

*FTC v. Network Servs. Depot, Inc.*,
617 F.3d 1127 (9th Cir. 2010) .................................................................... 28

*FTC v. Pantron I Corp.*,
33 F.3d 1088 (9th Cir. 1994) ................................................................ 10, 20

*FTC v. Publ'g Clearing House, Inc.*,
104 F.3d 1168 (9th Cir. 1997) ................................................................ 27, 28

*FTC v. RCG Advances, LLC*,
695 F. Supp. 3d 368 (S.D.N.Y. 2023) ......................................................... 28

*FTC v. Stefanchik*,
559 F.3d 924 (9th Cir. 2009) ........................................................................ 9

*Gamino v. Thinx, Inc.*,
2024 WL 2429307 (C.D. Cal., April 18, 2024) ......................................... 12

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018) ................................................................... 6, 33

*Lights of Am. Inc.*,
2011 WL 1515158 (C.D. Cal. Mar. 31, 2011) ............................................ 28

*Lopez v. Dave, Inc.*,
2022 WL 17089824 (N.D. Cal. Nov. 21, 2022) .......................................... 21

*Martinez v. Newport Beach City*,
125 F.3d 777 (9th Cir. 1997) ...................................................................... 32

*Moore v. Kayport Package Exp. Inc*,
885 F.2d 531 (9th Cir. 1989) .................................................................. 8, 25

*Moore v. Mars Petcare US, Inc.*,
966 F.3d 1007 (9th Cir. 2020) .................................................................... 11

*Morongo Band of Mission Indians v. Rose*,
893 F.2d 1074 (9th Cir. 1990) .................................................................... 32

*Rep. of Sudan v. Harrison*,
587 U.S. 1 (2019) ....................................................................................... 18

*Shields v. Credit One Bank, N.A.*,
32 F.4th 1218 (9th Cir. 2022) ....................................................................... 6

*Shroyer v. New Cingular Wireless Servs., Inc*,
622 F.3d 1035 (9th Cir. 2010) ...................................................................... 6

*Steinle v. City & Cnty. of San Francisco,*
 919 F.3d 1154 (9th Cir. 2019) ................................................................. 18

*U.S. v. Allied Oil Corp.,*
 341 U.S. 1 (1951) ................................................................................. 31

*U.S. v. MyLife.com, Inc.,*
 499 F. Supp. 3d 757 (C.D. Cal. 2020) ................................................ 7, 18, 29

*U.S. v. Nat'l Fin. Servs., Inc,*
 98 F.3d 131 (4th Cir. 1996) ...................................................................... 26

*U.S. v. Stratics Networks Inc.,*
 721 F. Supp. 3d 1080 (S.D. Cal. 2024) ............................................ 27, 29, 30

*U.S. v. United Healthcare Ins. Co.,*
 848 F.3d 1161 (9th Cir. 2016) ................................................................. 8, 30

*Walter v. Hughes Commc'ns, Inc.,*
 682 F. Supp. 2d 1031 (N.D. Cal. 2010) ...................................................... 13

*Wizards of the Coast LLC v. Cryptozoic Ent. LLC,*
 309 F.R.D. 645 (W.D. Wash. 2015) ........................................................... 32

**Statutes**

Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 41 et. seq. .................... passim

Restore Online Shoppers' Confidence Act ("ROSCA"), 15 U.S.C. § 8401 et seq.
 ..................................................................................................... passim

28 U.S.C. § 2462 ............................................................................................ 33

**Rules**

Fed. R. Civ. P. 8(a)(2) ....................................................................................... 7

Fed. R. Civ. P. 9(b) .......................................................................................... 7

Fed. R. Civ. P. 15(a)(1) .................................................................................... 34

Fed. R. Civ. P. 15(a)(2) .................................................................................... 34

Fed. R. Civ. P. 17 ............................................................................................ 33

Fed. R. Civ. P. 17(a)(1) .................................................................................... 33

Fed. R. Civ. P. 17(a)(3) .................................................................................... 33

Fed. R. Evid. 201(b) .................................................................................... 7, 36

**Regulations**

16 C.F.R. § 310.2(w) ....................................................................................... 18

-iii-

**INTRODUCTION**

Dave, Inc. ("Dave") and Jason Wilk targeted financially vulnerable consumers with promises of easy access to "instant" cash and then hit them with unexpected fees on small dollar or nonexistent cash advances, inescapable monthly subscriptions, and extra "tip" charges for pressing "Thank you." They now face allegations of deceptive trade practices in violation of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 41 et. seq., and illegal practices under the Restore Online Shoppers' Confidence Act ("ROSCA"), 15 U.S.C. § 8401 et seq. *See generally* Amended Complaint ("complaint"), Dkt. 44. Defendants moved to dismiss under Federal Rule 12(b)(6), arguing that the complaint fails to state a claim. *See generally* Defendants' Motion to Dismiss, Dkt. 50, and Defendants' Memorandum in Support ("Memo"), Dkt. 50-1. However, the motion to dismiss does not employ the Rule 12(b)(6) legal standard of review and instead prematurely argues the merits while ignoring the complaint's allegations and the relevant statutory text. The motion lacks merit and should be denied.

**CONDUCT ALLEGED IN THE COMPLAINT**

Dave operates under the leadership and direction of Jason Wilk, its co-founder, Chief Executive Officer, President, Chairman of the Board of Directors, and controlling shareholder. Compl. ¶¶ 1, 10. The business offers cash advances to "members" who subscribe by using a mobile application (the "app") to connect Defendants to their bank accounts. The cash advance services are marketed to financially vulnerable consumers—people who spend above their income, have minimal savings, and frequently encounter bank overdraft fees. *Id.* ¶ 1. These

vulnerabilities make Defendants' offer of "Extra Cash" attractive because Defendants promise "instant" cash advances of "up to $500" with no hidden fees. *Id.* ¶¶ 15-26.

The reality of Defendants' cash advances is quite different. Consumers who seek a cash advance must give Defendants direct access to their bank accounts through the app. Compl. ¶¶ 23-27. Direct bank account access is central to Defendants' business. Defendants use this access both to gather information about the consumer and to collect fees and repayments. *Id.* ¶ 30. Yet, at the time consumers connect their bank accounts, they will have little information about Defendants' service and its actual costs. The app's user interface directs consumers' action toward continuing the transaction and draws their attention away from any charges. *Id.* ¶¶ 26-28, 72. For instance, at the screen to connect a bank account, many consumers overlook the small, light-colored text below a cartoon bank, and above a green "connect account" button, that states "Dave charges a membership of $1 a month to connect to your bank." *Id.* And Defendants know that consumers often overlook this $1 fee disclosure. *Id.* ¶¶ 72-73. Internal documents acknowledge that the fee is "a surprise to members," and their customer service has received, on a monthly basis, hundreds of consumer inquiries on the topic "What is the $1 charge?" *Id.*

Moreover, even attentive consumers who notice the fine print and read Defendants' disclosures do not have full information on the terms of "Extra Cash." Specifically, consumers are unlikely to know that few users are offered anything close to $500, and many will be offered nothing at all. Compl. ¶¶ 29, 32-34, and 36. Indeed, during the first fourteen months that Defendants advertised "up to $500," Defendants offered a $500 cash advance only 0.002% of the time—a rate of less than

-2-

1 in 45,000. When a cash advance was offered, the average offer was $25. But more than three-quarters of first-time users were not offered any cash advance at all. Consumers have complained that Defendants "kept promising 500 for the past month and NEVER delivered" and that Dave's advertising is "misleading" because the company offers far less than advertised. *See, e.g., Id.* ¶¶ 34-40. Regardless of the amount offered, Defendants continue to charge a monthly membership fee. *Id.* ¶¶ 31, 34 and 35.

Consumers who do receive a cash advance are also met with another hidden fee that Defendants called an "Express Fee", which, despite advertisements promising "instant" cash, is the only way a consumer can receive their advance without waiting days. Compl. ¶¶ 42-43. Prior to accessing a consumer's bank account, Defendants' only references to an express fee for "Extra Cash" appear in obscure locations and employ vague and confusing language. *Id.* ¶ 45. Only if consumers are offered a cash advance are they then informed that the advertised "instant" access to cash will only occur if they pay an additional "Express Fee" of $3 to $25. *Id.* ¶¶ 42-45. Of course, Defendants know that this is not the "money now" service that they promise consumers in advertisements, and they have disregarded recommendations to "[s]et expectations much earlier on the true cost of the money [consumers] are borrowing", including hidden fees. *Id.* ¶ 43 (quoting an internal Dave presentation received by Wilk).

Defendants' surprise extra charges do not end there. After a consumer accepts a cash advance, the app shows an additional screen with a green "Thank you!" action button. Compl. ¶¶ 46-47. Unsuspecting consumers, who click that "Thank you!"

button, often do not realize that Defendants will automatically charge them an additional 15% "tip" simply for pressing "Thank you!". And for consumers who noticed inconspicuous text, the app's user interface contributes to this confusion by calling tips "optional" without providing a clear option for not tipping, such as a "no tip" action button. *Id.* ¶¶ 46-53.

Defendants regularly receive negative feedback from consumers about the additional "tip" charges, calling the app "sneaky," "[d]eceptive", and "absolute[ly] awful," after discovering that the 15% was charged as a "default." Compl. ¶¶ 48-49. And internal company documents noted that the lack of a clear option not to tip was a "pain point" for consumers. *Id.* ¶¶ 49-52. Yet, Defendants made no significant changes in response to consumer feedback. *Id.* ¶¶ 49-53. Rather, they offer no clear option for not "tipping" and charge "tips" to anyone who simply presses "Thank you." *Id.* ¶¶ 50-53. Moreover, even consumers who intended to "tip" are deceptively influenced by Defendants' promises to use the money to provide "healthy meals" to hungry children, whom the app represents by a cartoon child surrounded by food proportional to the "tip" amount. *Id.* ¶¶ 54-62. Defendants do not tell consumers that they kept the vast majority of "tip" charges as profit and do not actually donate enough to purchase the stated number of meals. *Id.* ¶¶ 63-65.

When consumers no longer want Defendants' service, they often cannot find a simple way to cancel the reoccurring monthly charge. Compl. ¶¶ 75-79. The app did not offer an in-app cancellation option, and simply deleting the app does not stop the charges. *Id.* ¶¶ 76-80. When consumers contact Defendants' customer service, Defendants employ three basic strategies to make cancellation "purposefully

confusing and hard": (1) point the consumer to an in-app process that, for many, does not exist, (2) demand more and more sensitive information until the consumer abandons the cancellation attempt, and (3) simply deny the ability to cancel—a strategy applied whenever Defendants can claim the consumer has an unpaid advance. *Id.* ¶¶ 81-83 and 84 (quoting a Dave executive).

Defendants have long known they operate in a highly regulated space and have recognized the need to comply with consumer protection laws against unfair and deceptive practices. Compl. ¶ 87. In January 2023, the Federal Trade Commission issued a Civil Investigative Demand that stated the FTC was investigating potential violations of the FTC Act and ROSCA in connection with Dave's sale and promotion of cash advance products. *Id.* ¶ 87. And following that demand, Dave was sued in early November 2024 by the Federal Trade Commission for violating the FTC Act and ROSCA. *Id.* ¶ 8; *see also* Dkt. 1. Defendants nevertheless continued their alleged misconduct. *Id.* ¶ 22. Indeed, according to the materials that the Defendants now submit for judicial notice, Defendants waited until the week before their response to the complaint was due to announce that the business had purportedly shifted from the "'tips' pricing model" to "simplified" fees. Dkt. 51-1 ("Pearl Decl."), at Ex. 2 at 14 (Def. 8-K) (Dave Press Release) (dated February 20, 2025).

## STANDARD OF REVIEW

Two Federal Rules of Civil Procedure provide the standard for evaluating a motion to dismiss:  Rule 12 provides the basis for moving to dismiss a complaint, and Rule 8 provides the pleading standard on which a motion to dismiss is evaluated.

## I.    Rule 12(b)(6) Focuses on the Complaint to Determine Its Legal Sufficiency.

When considering a motion under Rule 12(b)(6), courts presume the complaint's allegations are true and "draw all reasonable inferences in favor" of the non-moving party. *Shields v. Credit One Bank, N.A.,* 32 F.4th 1218, 1220 (9th Cir. 2022) (providing the presumption of truth). A motion to dismiss should be denied where the allegations "state a facially plausible claim to relief," *Shroyer v. New Cingular Wireless Servs., Inc,* 622 F.3d 1035, 1041 (9th Cir. 2010), which is satisfied by allegations that permit the Court to reasonably infer that Defendants are "liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Courts "[g]enerally . . . may not consider material outside the pleadings when assessing the sufficiency of a complaint." *Khoja v. Orexigen Therapeutics, Inc.* 899 F.3d 988, 998-99 (9th Cir. 2018). Judicial notice is an exception to this rule that applies only when a fact is generally known or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

## II.    The Complaint Is Not Subject to Federal Rule of Civil Procedure 9(b)'s Heightened Pleading Standard.

Federal Rule of Civil Procedure 8(a)(2) provides the general standard for pleading "a short and plain statement of the claim showing [entitlement] to relief." However, Rule 9(b) provides a heightened standard for "special matters," requiring pleading with "particularity" in fraud cases. The Ninth Circuit has never applied Federal Rule of Civil Procedure 9(b)'s heightened pleading standard to claims brought under the FTC Act.  Indeed, no federal circuit court has.  To the contrary, in a widely

followed decision, *FTC v. Freecom Commc'ns, Inc.*, the Tenth Circuit overruled a district court that applied 9(b)'s heightened pleading standard to FTC Act claims, holding that the district court's application of 9(b) was "inconsistent with the purpose of the FTC Act and highly impractical." 401 F.3d 1192, 1203 n.7 (10th Cir. 2005). The Tenth Circuit explained that a claim under the FTC Act "simply is not a claim of fraud as that term is commonly understood or as contemplated by Rule 9(b)" because the government does not need to prove common law fraud's elements, such as specific reliance or specific injury, to bring a claim for deceptive trade practices. *Id.* As such, the Tenth Circuit noted that holding the government to the heightened pleading standard "unduly hindered [the government's] ability to present its case." *Id.*

Without support in appellate case law, Defendants insist that "[d]istrict courts in the Ninth Circuit have routinely held that the heightened pleading standards of [Rule 9(b)] apply to deception claims under Section 5 of the FTC Act…". Memo at 15. That is not true. Ninth Circuit district courts disagree about whether the heightened pleading standard applies to FTC Act claims. Indeed, recently, the District of Arizona summarized decisions from the "many courts [that] have concluded that Rule 9(b) does not apply to claims brought under § 5 of the FTC Act. . .." and found them persuasive because FTC Act claims lack the elements of fraud. *FTC v. Grand Canyon Educ., Inc.,* 745 F. Supp. 3d 803, 837 (D. Ariz. 2024). Still, a common approach among district courts in the Ninth Circuit is to avoid the question, holding that even if 9(b) were to apply the complaint would meet the heightened pleading standard. *See, e.g. U.S. v. MyLife.com, Inc.*, 499 F. Supp. 3d 757, 761 (C.D. Cal. 2020) ("The Court

-7-

1   need not attempt to resolve that open legal question" when the complaint is pled with

2   "sufficient particularity to satisfy Rule 9(b).").

3          Nonetheless, even if Rule 9(b) were to apply, the complaint satisfies its

4   requirements. The touchstone for Rule 9(b) is whether a pleading "identifies the

5   circumstances constituting fraud so that a defendant can prepare an adequate answer

6   from the allegations." *Moore v. Kayport Package Exp. Inc,* 885 F.2d 531, 540 (9th Cir.

7   1989). Rule 9(b) "does not require absolute particularity or a recital of the evidence,

8   … a complaint need not allege 'a precise time frame,' 'describe in detail a single

9   specific transaction' or identify the 'precise method' used to carry out the fraud." *U.S.*

10  *v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1180 (9th Cir. 2016). Even so, here the

11  complaint names the main actors relevant to the claims, details the course of Athe

12  conduct at issue, enumerates the timeframe for conduct that continues to this day,

13  and identifies the law that the conduct violates. The complaint satisfies the pleading

14  standard.

## ARGUMENT

16         The complaint contains five counts. The first two allege violations of the FTC

17  Act, 15 U.S.C. § 45(a), (Section 5(a)), which prohibits "unfair or deceptive acts or

18  practices" in commerce. Count I arises from Defendants' representations that

19  consumers can receive a cash advance of an advertised amount instantly and without

20  hidden fees. Compl. ¶¶ 91-94. Count II arises from Defendants' "tipping" charges,

21  which were imposed through a deceptive interface. *Id.* ¶¶ 95-98.

22         The last three counts allege violations of ROSCA, a statute that prohibits the

23  use of a negative option feature, such as a recurring monthly subscription to service,

unless the seller satisfies three requirements: (1) clear and conspicuous disclosure of all material terms before obtaining billing information, (2) express informed consent from the consumer, and (3) a simple mechanism to stop recurring charges. 15 U.S.C. § 8403. The complaint alleges that Defendants' subscription-based cash advance service separately violated all three requirements. Compl. ¶¶ 99-116.

The motion to dismiss challenges each of the complaint's five counts and additionally challenges the allegations of civil penalty liability, individual liability, and the government's decision to amend the complaint. These arguments lack merit, and the motion should be denied.

## I.    The Complaint States Claims Under Section 5(a) of the FTC Act for Misrepresentations About Cash Advances and "Tips".

Section 5(a) protects consumers from unfair and deceptive acts. 15 U.S.C. § 45(a). A claim alleging deceptive acts and practices under Section 5(a) requires that "*first*, there is a representation, omission, or practice, that, *second* is likely to mislead consumers acting reasonably under the circumstances, and *third*, the representation, omission, or practice is material." *FTC v. Stefanchik,* 559 F.3d 924, 928 (9th Cir. 2009) (emphasis added). The Ninth Circuit focuses on the "net impression" that the totality of a defendant's statements create, *id.,* and the law recognizes that even literally true statements can create a misleading net impression, *see FTC v. Cyberspace.com LLC*, 453 F.3d 1196, 1200 (9th Cir. 2006) (collecting cases). Fine print disclosures cannot save an otherwise misleading net impression, especially when the disclosures are hard to find or fail to unambiguously correct the misleading impression. *Id.; FTC v. Doxo, Inc.,* 2025 WL 887311, at *8 (W.D. Wash., March 21, 2025) ("Courts across the country

-9-

have determined that, where a disclaimer is buried in fine print and is without accentuation, it is insufficient to alter the net impression.") (pub. pending). And, relying on fine print disclosures is a particularly "unavailing" argument for defendants at the pleading stage attempting to counter a deception claim. *FTC v. Am. Fin. Benefits Ctr.*, 324 F. Supp. 3d 1067, 1078 (N.D. Cal. 2018). Moreover, although proof of actual deception is not necessary, "such proof is highly probative to show that a practice is likely to mislead consumers acting reasonably under the circumstances." *Cyberspace.com LLC*, 453 F.3d at 1201.

The complaint contains all three allegations to sustain Section 5(a) claims. First, it details the app's representations that consumers can receive instant cash advances up to $500, and it details the information shown when consumers press "Thank you," and are immediately charged for a "tip". *See, e.g.,* Compl. ¶¶ 15-31; 46-69. These representations are likely to deceive consumers about both the probability of being offered a significant "ExtraCash" cash advance and the real cost of that advance, and indeed, the complaint alleges that numerous consumers have been deceived. *Id.* ¶¶ 38-39; 48. Moreover, the probability of receiving $500 and the real cost of "ExtraCash" are material terms that are "likely to affect [a consumer's] choice of, or conduct regarding, a product." *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1096 n.20 (9th Cir. 1994). The complaint alleges that numerous consumers have stated they would not have used the app if they had understood the service, including its real cost of the service. *See, e.g.,* Compl. ¶ 48.

Dismissal as a matter of law is rarely appropriate for Section 5(a) claims. *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1162 (9th Cir. 2012) ("[W]hether a

1  business practice is deceptive will usually be a question of fact not appropriate for

2  decision on [a motion to dismiss]"). Indeed, at the motion to dismiss stage, the Ninth

3  Circuit has found that dismissal of a deception claim is warranted only if "common

4  sense would not lead anyone to be misled." *Moore v. Mars Petcare US, Inc.*, 966 F.3d

5  1007, 1018 (9th Cir. 2020). This is an impossible standard for Defendants to meet

6  when their cash advance promotions touted instant, inexpensive access to "up to

7  $500," and consumers reported being misled by these promotions. The motion to

8  dismiss should be denied.

9          **1.    Count I States a Deceptive Practices Claim for Creating the**

10                 **Misleading Impression that Consumers Would Receive Cash**

11                 **Advances of Up To $500 Instantly and Without Hidden Fees.**

12         Count I alleges that Defendants deceptively told consumers that they can

13  receive cash advances "up to" a particular amount without being charged any hidden

14  fees. Defendants take issue with only the "up to" representations and do not dispute

15  that Count I states a claim relating to representations that their cash advances are

16  available instantly without any hidden fees. Nor could they successfully dispute that

17  point, as the complaint is replete with allegations that Defendants made such

18  representations (*see, e.g.,* ¶¶ 2, 13, 15, 33, 92), that they were likely to mislead consumers

19  (*e.g.,* ¶¶ 2-4, 33, 42-45, 73), and that they mattered to consumers considering

20  Defendants' product (*e.g.,* ¶¶ 38-41, 47-52, 73).

21         Defendants' only argument for dismissing Count I concerns their promises of

22  cash advances "up to $500," claiming that "Dave can, does and did provide $500

23  advances" and that consumers seeing their ads would not "think that they were

-11-

guaranteed to get $500." Memo at 35, 37.  But even in situations where consumers know that "results may vary," advertisements are deceptive when "the vast majority of consumers did not earn the amount represented as the earning potential." *FTC v. Medicor LLC*, 217 F. Supp. 2d 1048, 1053-54 (C.D. Cal. 2002). Defendants' $500 cash advances were exceedingly rare—so rare, in fact, that across the first fourteen months Defendants advertised them, they offered new users a $500 advance only 0.002% of the time and offered repeat users $500 less than 1% of the time. Compl. ¶¶ 34, 36. Moreover, three quarters of new customers were not offered any cash advance at all, and the most common offer was $25. *Id.* Thus, it was misleading to give consumers the impression they had an appreciable chance of receiving $500 through the app, and the complaint alleges that many consumers were in fact misled. Compl. ¶¶ 38-41; *and see also FTC v. FleetCor Techs., Inc.*, 620 F. Supp. 3d 1268, 1297 n.8 (N.D. Ga. 2022) (holding that an "up to" claim "at the very least conveys a net impression that a customer will achieve something close to" the advertised amount).

        In addition, Defendants characterize their prominently advertised claims of cash advances "up to $500" as mere "puffery" that cannot be deceptive as a matter of law. Memo at 33-37. Multiple courts have rejected that characterization and found that "up to" representations can materially mislead reasonable consumers. *Gamino v. Thinx, Inc.*, 2024 WL 2429307 at *8 (C.D. Cal., April 18, 2024) (summarizing cases). "Up to" representations are especially prone to being misleading when they reference a particular, quantified amount. *Id., following FTC v. Frontier Comm. Corp.*, 2021 WL 6540379 at *6 (C.D. Cal., Oct. 3, 2021). Accordingly, "up to" language that "disclose[s] hard, measurable quantities"—like the specific dollar amount Dave allegedly

-12-

advertised— "[can]not be characterized as mere puffery." *Walter v. Hughes Commc'ns, Inc.*, 682 F. Supp. 2d 1031, 1044 (N.D. Cal. 2010) (denying a motion to dismiss claims alleging deceptive "up to" representations). This is a critical distinction. Defendants argue that the Court should follow cases in which the product claims are difficult to quantify or inherently variable, *see* Memo at 34-35, but $500 is a particular, quantified amount that varies only at the Defendants' discretion.

Defendants' "additional disclosures" do not render their marketing non-deceptive. *See* Memo at 37-39 (citing "terms apply."). The complaint alleges that "[n]either Dave's ads nor its app store content inform consumers that very few consumers receive cash advances for the advertised $500," and that apart from Defendants' prominent "up to" claims, "the only references to the amount of consumers' advances . . . typically are in small print, are buried in block text, use vague or confusing language, and/or are found in obscure locations." Compl. ¶ 37. Simply stating "terms apply" does not alter the net impression of Defendants' promotions, which offer money "instantly" and state that "all you need to do is download this app." Compl. ¶ 15. That is particularly true because Defendants use design elements within the app to intentionally draw attention away from any purported disclosures. *Id.* ¶¶ 17-18; 23-28; 39-40. Moreover, even consumers who find Defendants' purported disclosures would see that they are silent as to odds of receiving a cash advance at the advertised amount, they omit that consumers cannot obtain funds "instantly" without a fee, and they fail to describe how a consumer might avoid giving a "tip." *Id.* ¶ 29. Defendants' simple note that "terms apply" does not warrant dismissing Count I.

-13-

### 2. Count II States a Deceptive Practices Claim Regarding "Tipping."

Count II alleges that Defendants' "tipping" practices create a misleading net impression about when consumers are being charged "tips," whether those tips are avoidable, and what Defendants do with consumers' tips. Compl. ¶¶ 95-98.

Defendants' argument for dismissing Count II focuses almost entirely on a selectively magnified part of the "tipping" screen shown to consumers. Memo at 38-41.



| Full Screenshot from the Complaint, ¶ 46 | Defendants' Selective Representation, Memo at 38 |
|---|---|

Defendants' motion claims that from the "statements and product flow" on this screen "a reasonable consumer would have . . . understood that clicking 'Thank you!' completed the transaction, including any tip." Memo at 42. But that assertion

1   ignores that the most prominent elements of the screen—the bold heading "Your

2   advance is on its way!" and the large green "Thank you!" button—provide no inkling

3   that the screen is soliciting an additional charge, and Defendants gave no prior

4   warning to consumers that they might be charged for a "tip." Compl. ¶¶ 46-48.

5   Indeed, nothing on the screen states that a tap of the large green "Thank you!" button

6   would be taken as a consumer's consent to charge a "tip". And even if consumers

7   realized Defendants were seeking to impose an additional charge, the screen contains

8   many other deceptive elements.  For example, the "Thank you!" button was the only

9   place the consumer could tap to move past this screen that did *not* reference a tip or

10  charitable donation. Compl. ¶¶ 46.

11      Defendants' selective screenshot ironically highlights another of their

12  deceptions regarding "tips"—the claim that "tips" were "optional" when the app

13  provided no clear option to avoid tipping. *Id.* ¶¶ 46-57. Indeed, consumers could

14  avoid these "tipping" charges only by first noticing and then counter-intuitively

15  pressing the "custom tip" button, which is approximately half the size of the "Thank

16  you!" button and is colored white against a white background. *Id.* ¶¶ 58-61.

17      The complaint alleges that Defendants knew this was a common point of anger

18  and frustration for consumers, but they did not change the interface to resolve it. *Id.*

19  Defendants acknowledged that this "[d]ark" user interface made "selecting a custom []

20  tip unnoticeable" and failed to provide "an obvious 'no tip' button," which resulted in

21  consumers "having a hard time" avoiding charges. *Id.* ¶¶ 52-53. Internal Dave

22  documents recommended implementing changes to make "the option to not tip be

23

-15-

1    clear" and "adding a '[n]o tip button,'" but Defendants chose to instead keep their

2    misleading interface. *Id.* ¶¶ 50-51. These deceptions alone sustain Count II's claim.

3        Defendants also try to sidestep another major misrepresentation—the illusion

4    that tips will provide a particular number of meals to people in need. Defendants'

5    motion points to the small fraction of "tips" that went to charity and argues that the

6    Government does not allege that this small fraction "was insufficient to provide the

7    designated number of meals." Memo at 40. But the complaint *does* allege exactly that.

8    Specifically, it alleges that "Dave does not pay for or donate a specified number of

9    meals to children in need based on its user tips," and that instead, "for each

10   percentage point of a 'tip' charged to a consumer, Dave donates only 10 cents and

11   keeps the rest," which is a donation of "far less than it would cost" the recipient

12   organization to buy a meal "or to purchase and prepare the food" for it. Compl. ¶ 64.

13   The complaint further alleges that Defendants knew their "Healthy Meals" tipping

14   interface had "been called out by industry advocates and media publications as

15   manipulative and misleading," but decided not to change it because Defendant "Wilk

16   concluded that Dave's . . . strategy of presenting 'tips' as connected to the provision

17   of healthy meals was important to preserving the company's revenue." *Id.* ¶¶ 65-69.

18       Finally, Defendants return to their legal argument that "additional disclosures"

19   cured any deception. Memo at 38-41. That argument is not only inconsistent with

20   Ninth Circuit law, but also especially unavailing when the complaint alleges that the

21   "additional disclosures" were themselves deceptive. *See Cyberspace.Com LLC*, 453 F.3d

22   at 1200 ("fine print" does not cure misrepresentations), *and* Compl. ¶¶ 29, 63-64

23   (alleging that additional disclosures did not describe a clear option for not tipping and

-16-

1    materially omitted the fact that Defendants pocketed most of the "tips."). Defendants'

2    purported "additional disclosures" do not prevent Count II from stating a claim.

3    **II.    The Complaint States Three Claims Under ROSCA for Lacking**

4    **Clear and Conspicuous Disclosures, Express Informed Consent**

5    **and a Simple Mechanism to Stop Charges.**

6    Congress enacted ROSCA to provide online consumers with "clear, accurate

7    information and give sellers an opportunity to fairly compete. . . ." 15 U.S.C. § 8401

8    (Declaration of policy). The law is particularly concerned with "negative option

9    features," which treat a consumer's inaction as acceptance of an offer. *See* FTC

10   Telemarketing Sales Rule, 16 C.F.R. § 310.2(w) (defining negative options). And it

11   provided that all negative option features must satisfy three requirements: (1) clearly

12   and conspicuously disclose all material terms before collecting a consumer's billing

13   information, (2) obtain a consumer's express, informed consent before making a

14   charge, *and* (3) provide a simple mechanism for cancellation. 15 U.S.C. § 8403

15   (Negative Option Marketing on the Internet). Violations of those requirements

16   constitute unfair or deceptive acts in violation of the FTC Act. 15 U.S.C. § 8404

17   (Enforcement); and 15 U.S.C. § 57a(d)(3) (ROSCA violations are FTC rule violations).

18   For ROSCA violations, the Court may impose injunctive relief, 15 U.S.C. § 53(b), and

19   equitable relief to redress injuries to consumers, *id.* § 57b. Moreover, the Court may

20   also impose civil penalties whenever a ROSCA violation is committed with "actual

21   knowledge or knowledge fairly implied." *Id.* § 45(m)(1)(A).

22   Defendants' automatically renewing membership, which consumers enroll in to

23   try to obtain cash advances, is a negative option feature subject to ROSCA. *See*

-17-

1  *MyLife.com, Inc.,* 499 F. Supp. 3d at 761-62 (holding that subscription plans for services

2  with automatic recurring charges are negative option features); *and Doxo,* 2025 WL

3  887311 at * 10 (W.D. Wash, March 21, 2025) (a month-to-month subscription that

4  must be cancelled to avoid additional charges is a negative option feature). Still,

5  Defendants try to avoid ROSCA in two ways. First, Defendants simply sidestep the

6  statutory text, preferring to discuss a subsequent regulation, legislative history and

7  dissents from individual FTC Commissioners. *See* Memo at 16-21 (relegating the

8  statutory text to a footnote and discussing the "click-to-cancel" rulemaking at length).

9  Yet, the statute itself provides the controlling law, and when interpreting clear

10  statutory language, the Court's analysis begins and ends with the statute.  *Rep. of Sudan*

11  *v. Harrison*, 587 U.S. 1, 8 (2019); *and see Steinle v. City & Cnty. of San Francisco*, 919 F.3d

12  1154, 1164 (9th Cir. 2019) (courts "turn to extrinsic materials" to interpret a statute

13  only when the language is ambiguous). Second, Defendants argue that they did not

14  have "fair notice" of the Government's "newly articulated interpretation" of ROSCA.

15  Memo at 19-21. However, "[t]he relevant question is not whether [Defendants] had

16  fair notice of the FTC's *interpretation of* the statute, but whether [Defendants] had fair

17  notice of what *the statute itself* requires." *FTC v. Amazon.com, Inc.*, 735 F. Supp. 3d 1297,

18  1330-1 (W.D. Wash. 2024) (rejecting a similar "fair notice" argument under ROSCA)

19  (quotation omitted, emphasis original). Here, Defendants had both the clear text of

20  ROSCA and "a plethora of state and federal caselaw" from similar consumer

21  protection statutes interpreting similar terms. *See id.* at 1331.  Defendants had fair

22  notice that their deceptive conduct and membership plans were illegal.

23

-18-

**1.  Count III States a ROSCA Claim For Failure to Clearly and Conspicuously Disclose Multiple Material Terms.**

Defendants argue that the $1 monthly fee was the only material term of their cash advance membership and thus the only term subject to ROSCA.  Memo at 16-21. But Defendants' argument that all other terms related to their cash advances are immaterial ignores the statutory text, the nature of their product, and the law on materiality.

The complaint's allegations center on cash advances that Defendants provide to consumers only through a monthly membership plan that imposes recurring charges unless the consumer takes affirmative action to stop it. Compl. ¶¶ 1-4 (Summary of the Case). ROSCA prohibits charging any consumer "for any goods or services sold in a transaction effected on the Internet through a negative option feature" unless, among other requirements, the marketer "clearly and conspicuously discloses all materials terms of the transaction before obtaining the consumer's billing information." 15 U.S.C. § 8403.

Defendants' membership subscription is a negative option feature.  And the supposedly instant cash advances of up to $500 that are promoted in Defendants' advertising, Compl. ¶¶ 15, 17-22, and in their app, *id.* ¶¶ 23-26, are only available to consumers who have first been enrolled in Defendants' negative option subscription, *id.* ¶ 70. Because Defendants' cash advance goods or services are sold in a transaction effected on the Internet through a negative option feature, Defendants must disclose "all material terms" of the transaction for cash advance goods or services, not merely the terms of the negative option feature. This includes the material terms that

-19-

Defendants offer cash advances at or near the amounts advertised to very few consumers, that consumers cannot obtain cash advances instantly without waiting unless they pay an additional fee, and that Defendants charge consumers an additional fee that they refer to as a "tip." *Id.* A term is material if it "involves information that is important to and, hence, likely to affect their choice of, or conduct regarding, a product." *FTC v. Cyberspace.Com LLC*, 453 F.3d 1196, 1201 (9th Cir. 2006)(citation omitted). And "[e]xpress product claims are presumed to be material." *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1096 (9th Cir. 1994). The basic features of a product sold via a negative option product are squarely material terms requiring disclosure under ROSCA. *Doxo, Inc.*, 2025 WL 887311, at *10 (denying motion to dismiss ROSCA claims because delivery fees applicable to the underlying product were material terms of the transaction and were not adequately disclosed).

Here there is no doubt that the value of the cash advance product, the speed of funding, and the additional charges styled as "tips," affect a consumer's willingness to enroll in a membership for cash advances, and indeed, many consumers have stated that they subscribed to Defendants' services because of the cash advance promises. *See, e.g.,* Compl. ¶ 39 (consumers downloaded the app and put in bank information because "they kept promising 500").

Defendants' argument that apart from the monthly membership fee, all other terms related to their cash advances are immaterial under ROSCA is belied by the flow of the Dave app. Defendants entice consumers to download the app *specifically* for its cash advances, which they prominently advertise as providing "up to $500" instantly or within minutes and without any hidden fees. Compl. ¶¶ 23-26. Even after

consumers downloaded the app, Defendants specifically pushed the cash advance service, which constitutes a large part of their revenue. *Id.* ¶¶ 27-31. Thus, it is clear that a reasonable consumer would find cash advances' availability, amount, and costs are material because consumers' understandings of those terms played a direct role in their decision whether to sign up with Dave. As enumerated in the complaint, numerous consumer complaints reinforce that they found each of these terms material to their decision. *See, e.g.*, *Id.* ¶ 39.

Defendants next try to argue that their purported disclosures were "clear," "conspicuous," and "true." Memo at 21-30. Yet, this argument misplaces the focus by arguing about "terms" that a consumer might encounter if she left the app's primary action buttons to "see terms." *See, e.g., id.* at 24-25 (arguing that consumers could click a small hyperlink). As a matter of law, placement of terms behind an easy-to-miss disclosure is not sufficient to make anything "clear and conspicuous." Under the plain meaning of "conspicuous," disclosures must be prominent such that a reasonable person would notice them. *See Black's Law Dictionary* (9th ed. 2009) (defining "conspicuous" to refer to items that are "clearly visible," "obvious," and "written [so that] a reasonable person . . . ought to notice it"). And hyperlinks to a separate and optional terms page are not clear and conspicuous. *FTC v. Health Formulas, LLC* 2015 WL 2130504, at *16 (D. Nev. May 6, 2015) (holding disclosures contained in fine print or on separate, optional terms page are not clear and conspicuous); *and see Lopez v. Dave, Inc.*, 2022 WL 17089824, at *1-2 (N.D. Cal. Nov. 21, 2022) (holding that Dave failed to provide clear and conspicuous disclosure of arbitration clause because it was hidden behind an unclear hyperlink in the fine print).

-21-

Even if a consumer were to find Defendants' small print and click their "terms," another controlling question is whether that consumer would find "all the material terms of the transaction." *Compare* Memo at 23-26, *with* 15 U.S.C. § 8403. And the answer to that question is no. The material terms, such as the real cost of the product, the availability of significant cash amounts, and the details of "tip" charges, were not disclosed to consumers at all. *See* Compl. ¶ 29 (alleging that even consumers "who actually locate and review the inconspicuous text still are not informed of key information.").

The complaint alleges that even the existence of Defendants' automatically recurring $1 membership fee—the one term Defendants apparently concede is material under ROSCA—is not clearly and conspicuously disclosed. The only mention of this fee during the entire consumer flow is on a screen where users are prompted in large text to "Enter your primary bank" information. Compl. ¶¶ 27-28. That screen uses multiple sizes and colors of text, and it references the fee only in small, light-colored grey print. *Id.* The complaint thus alleges that this "user interface draws consumers' attention toward continuing with Dave's services, and away from the terms of those services, including by using design elements such as placement, color, text size, and action buttons to guide the consumer through the app." *Id.* The lack of clear, conspicuous disclosure is further evidenced by allegations that numerous consumers were unaware of the fee and were surprised and upset to learn that Defendants were charging it. *Id.* ¶¶ 70-74; *see also Cyberspace.com, LLC*, 453 F.3d at 1201 (recognizing the fact that consumers are in fact misled is probative of objectively misleading disclosures). And Defendants' motion offers no retort to the allegations

-22-

that Defendants fail to clearly and conspicuously disclose that this fee "will automatically recur until the consumer takes action to cancel it." Compl. ¶¶ 106(d); *see also* ¶¶ 78-91.

Indeed, the complaint's allegations that many consumers were misled about several key aspects of Defendants' product, including the amounts and availability of cash advances and the true costs of obtaining them, underscores that significant material terms were not clearly disclosed. *See* Compl. ¶ 90.

### 2. Count IV States a ROSCA Claim For Failure to Obtain Express Informed Consent.

In response to Count IV, Defendants repeat conclusory statements about their purported "disclosures." Memo at 28. Yet, the need to obtain consumers' express informed consent is a separate statutory requirement that independently gives rise to a claim. 15 U.S.C. § 8403(2). Of course, as a practical matter, a seller who does not provide adequate disclosures often does not obtain express informed consent. *Amazon.com, Inc.,* 735 F. Supp. 3d at 1321, *following Health Formulas,* 2015 WL 2130504 at *16. That occurred here. However, sellers can also to fail to obtain "express informed consent" by designing a process that charges consumers who have not actually agreed to be charged. *Id.* That also occurred here. The classic example of an inadequate process is acceptance by simply clicking a green "continue" button as a manifestation of assent. *Id., following Berman v. Freedom Fin. Network, LLC,* 30 F.4th 849, 857-58 (9th Cir. 2022). "[M]erely clicking on a button … viewed in the abstract, does not signify a user's agreement to anything." *Berman*, 30 F.4th at 857. Defendants' entire interface is a series of green buttons with abstract prompts, "Sign up for Dave,"

1   "Get started," "Connect account," and then simply "Thank you!" *See* Compl., ¶¶ 25,

2   27, 46. The complaint is replete with allegations that, through these processes,

3   Defendants routinely charged consumers for $1 subscription fees and so-called "tips"

4   without even consumers' knowledge, let alone their consent. Compl. ¶¶ 47-53, 72-73.

5   In light of these allegations, Count IV states a claim under ROSCA.

6              **3.  Count V States a ROSCA Claim for Failure to Provide a Simple**

7                 **Mechanism to Stop Recurring Charges.**

8        Defendants' argument regarding cancellation mechanisms confuses both the

9   applicable law and the pleading standard.

10       Regarding the law, ROSCA demands that sellers must "provide[] a simple

11   mechanism to stop recurring charges." 15 U.S.C. § 8403(3). Defendants confuse this

12   requirement with a subsequent FTC regulation that did not become effective until

13   after the Amended Complaint was filed. *See e.g.,* Memo at 17-19 (discussing the "Click-

14   to-Cancel" rule that became effective in January 2025). But the subsequent rulemaking

15   did not invalidate enforcement of ROSCA's long-existing statutory requirements, and

16   indeed, for many years, courts have found violations of ROSCA's "simple

17   mechanism" provision without the "click-to-cancel" rule. *See Amazon.com, Inc.*, 735 F.

18   Supp. 3d at 1322-23 (collecting cases). Independent of the click-to-cancel rule,

19   ROSCA requires that sellers provide cancellation methods that are "not difficult,

20   costly, confusing or time consuming" and "must be at least as simple as the

21   mechanism used to initiate the [c]harge." *Id., quoting FTC v. Cardiff*, 2019 WL 9143561

22   at *10 (C.D. Cal. May 16, 2019). Cancellation methods that complicate the process

23

with multiple steps and attempt to prevent the consumer from cancelling do not satisfy ROSCA's requirement for a simple mechanism.

The complaint alleges that Defendants sometimes refuse to cancel subscriptions through *any* mechanism, fail to provide many consumers an in-app cancellation option, and obscure information about how to stop recurring charges to such a degree that at times, even Defendants' employees could not figure out how to do it. Compl. ¶¶ 77-80, 85. Moreover, even consumers who are ultimately able to cancel are put through a lengthy and discouraging multi-step process with Defendants' customer service. *Id.* ¶¶ 81-84. These non-existent and intentionally complicated cancellation processes violate ROSCA.

Defendants further challenge Count V by asserting that the government must explain exactly "what Dave should have done to make the process of avoiding recurring charges simpler. . ." and cannot rely on a "barrage of anonymous [consumer complaints]." Memo at 28-30. Those assertions misunderstand the pleading standard and mischaracterize the complaint's allegations, which include ample description of Defendants' failure to provide a simple cancellation mechanism. Even under the heightened standard of Rule 9(b), the complaint would only need to provide Defendants adequate information to prepare an answer. *Kayport Package Exp. Inc.,* 885 F.2d at 540. The complaint does not need to describe a hypothetical, alternative business model for Defendants. It simply needs to allege that the business model that they currently employ violates the law. Similarly, the complaint does not need to restate details that are already within Defendants' knowledge, *Kayport Package Exp. Inc.,* 885 F.2d at 540. The "barrage" of consumer complaints described in the complaint is

1  summarized in Defendants' internal documents. *See, e.g.,* Compl. ¶ 83 (referring to an

2  internal company analysis of Better Business Bureau complaints).  The complaint does

3  not need to publicly call out Defendants' customers individually by name in order to

4  provide Defendants with notice of allegations based on their own documents.

5  **4.  Counts III, IV and V Provide a Legal Basis for Civil Penalties.**

6  To obtain civil monetary penalties under ROSCA, the Government must

7  demonstrate that the defendant had "actual knowledge or knowledge fairly implied on

8  the basis of objective circumstances that such act is unfair or deceptive and is

9  prohibited by such rule." 15 U.S.C. § 45(m)(1)(A). Thus, a defendant is liable for civil

10  penalties when they had actual knowledge of ROSCA violations or "where a

11  reasonable person under the circumstances would have known of the existence of the

12  provision and that the action charged violated that provision." *U.S. v. Nat'l Fin. Servs.,*

13  *Inc.,* 98 F.3d 131, 139 (4th Cir. 1996) (reviewing S. Rep. No. 93-1408, at 40 (1974)

14  U.S.C.C.A.N. 1772).

15  Here, the complaint alleges actual knowledge of ROSCA violations by a

16  sophisticated corporation and its principal officer, who operate in a highly regulated

17  space, run a compliance system to address legal and regulatory scrutiny pursuant to

18  the FTC Act and similar laws, and, as of January 2023, knew that the FTC was

19  investigating Dave for potential ROSCA violations. Compl. ¶ 87; *and see Amazon.com,*

20  *Inc.,* 735 F. 3d at 1333 (finding a reasonable company that operated a subscription

21  service with an auto-renewal feature would be aware of ROSCA's requirements and

22  the state of federal law regulating negative option marketing). It further alleges that

23  Defendants received and internally analyzed numerous complaints from consumers

-26-

1    who were misled by or unaware of key terms of Dave's services or who found it

2    nearly impossible to cancel recurring charges, including complaints that Dave was

3    breaking the law and violating ROSCA. Compl. ¶ 87. Receipt of such consumer

4    complaints suffice as a matter of law as a basis for alleging knowledge. *Amazon.com,*

5    *Inc.*, 735 F. Supp. 3d  at 1333-34 (rejecting motion to dismiss where corporation and

6    individuals allegedly received internal reports of customer confusion, finding FTC

7    plausibly alleged "actual or constructive knowledge" of ROSCA violations); *U.S. v.*

8    *Stratics Networks Inc.*, 721 F. Supp. 3d 1080, 1101 (S.D. Cal. 2024) (denying motion to

9    dismiss request for civil penalties where receipt of consumer complaints plausibly

10   alleged defendants' knowledge of rule violations).

11          Additionally, the complaint alleges ample indicia of constructive knowledge,

12   including internal analyses imploring change to the app and thousands of consumers

13   seeking to cancel their accounts each month upon discovering Defendants'

14   misrepresentations. *See, e.g.* Compl. ¶¶ 40, 41, 49, 51-52, 67-69. These allegations more

15   than suffice to allege the level of knowledge required for civil penalties.

16   **III.    Jason Wilk Faces Individual Liability for the Unlawful Activities**

17          **Alleged in the Complaint.**

18          An individual faces liability under the FTC Act if after alleging corporate

19   liability, a complaint alleges that the individual "participated directly in the acts or

20   practices <u>or</u> had authority to control them." *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d

21   1168, 1170 (9th Cir. 1997) (quoting *FTC v. Am. Standard Credit Sys., Inc.*, 874 F. 1080,

22   1089 (C.D. Cal. 1994) (emphasis added). An individual's mental state has no bearing

23   on whether they face injunctive relief, but the individual also faces monetary liability

-27-

to redress consumers pursuant to Section 19 of the FTC Act, 15 U.S.C. § 57b(b), for violations of ROSCA if they possessed actual knowledge of unlawful corporate practices, operated with reckless indifference to unlawful practices, or possessed an awareness of a high probability of unlawful practices. *FTC v. Network Servs. Depot, Inc.,* 617 F.3d 1127, 1138-1139 (9th Cir. 2010); *FTC v. RCG Advances, LLC*, 695 F. Supp. 3d 368, 386-87, 391-92 (S.D.N.Y. 2023) (finding individual liable for compensatory damages pursuant to Section 19 for rule violation using the same knowledge standard as used for finding Section 5(a) liability); *see also FTC v. Credit Bureau Ctr., LLC*, 2021 WL 4146884, at *12 (N.D. Ill. Sept. 13, 2021) (amending judgment to award monetary redress for ROSCA violations pursuant to Section 19). The complaint adequately alleges Jason Wilk's potential liability for injunctive and monetary relief.

Wilk is Dave's co-founder, Chief Executive Officer, President, Chairman of the Board of Directors, and controlling shareholder. Compl., ¶ 10. That status alone establishes individual liability. *FTC v. Dinamica Financiera LLC*, 2010 WL 9488821, at *10 (C.D. Cal. Aug. 19, 2010) (citing *Publ'g Clearing House, Inc.,* 104 F.3d at 1170). Indeed, status as "president and director" of a company engaged in deceptive practice is "the most important fact for individual liability under Section 5". *FTC v. Com. Planet, Inc.*, 2010 WL 11673796, at *2 (C.D. Cal. Feb. 12, 2010). Moreover, "[a]ctive involvement in [the company's] business affairs . . . support[s] a reasonable inference that [defendants] were aware." *Lights of Am. Inc.*, 2011 WL 1515158, at *2-4 (C.D. Cal. Mar. 31, 2011). Here, the allegations go further, and provide that Wilk had knowing, direct participation in the company's unlawful practices. *See, e.g.,* Compl. ¶ 40 (Wilk knew consumers were unhappy with the substantial difference between advertised and

1    offered cash amounts); ¶ 43 (Wilk decided to keep deceptive express fees); ¶¶ 47, 67-

2    69 (Wilk designed and implemented the app's deceptive "tipping" mechanism); and ¶

3    73 (Wilk knew about deceptive membership fee charges). Indeed, these allegations are

4    quite similar to the *U.S. v. MyLife* and *U.S. v. Stratics Networks Inc.* cases, which found

5    requisite knowledge following the receipt of consumer complaints. *See* 499 F. Supp.

6    3d at 755 (consumer complaints demonstrated knowledge) *and* 721 F. Supp. 3d 1080,

7    1102 (S.D. Cal. 2024) (same). Defendants attempt to distinguish those cases by noting

8    that those complaints also referenced the defendants' involvement in prior litigation.

9    Memo at 44.  But neither court found that prior litigation was necessary to its holding.

10    *See MyLife.com*, 499 F. Supp. 3d at 755 (disclosing consumer complaints alone as a

11    basis for knowledge) *and Stratics Networks Inc.,* 721 F. Supp. 3d at 1101 (same).

12        Defendants also claim that Wilk cannot possibly be liable for monetary relief

13    because "the CFPB had investigated and decided not to pursue an enforcement

14    action," against Dave, which supposedly gave him "first-hand evidence that the

15    Company was not acting contrary to law." *See* Memo at 45. Even if the CFPB

16    investigation had been alleged in the complaint, it would be absurd for Wilk to

17    conclude from the fact that the CFPB did not sue Dave that the company must

18    therefore be in full compliance with all laws for all time. Moreover, the complaint

19    alleges that subsequently, in "January 2023, the FTC issued Dave a Civil Investigative

20    Demand that stated the FTC was investigating Dave's potential violations of the FTC

21    Act and ROSCA in connection with the company's sale and promotion of its case

22    advance products"—i.e., the statutes and conduct that are actually at issue in the

23    complaint. Compl. ¶ 87. Defendants' participation in that FTC investigation evinces

knowledge. *See, e.g, Stratics Networks Inc.*, 721 F. Supp. 3d at 1102 (participation with past investigation was evidence of executive's knowledge). The complaint states claims for Wilk's individual liability. *See* Compl. ¶¶ 10, 40, 43, 47, 65, 69, and 73.

Defendants further assert that the allegations against Wilk are "vague as to time," and "time-barred." Memo at 42-43, but this argument misses key allegations and confuses the law. The complaint alleges that Wilk has served as CEO since 2016, that Dave has advertised its cash advance product since 2020, and that Defendants continue to engage in unlawful conduct, which the complaint describes as continuing to the present, even after the FTC issued its Civil Investigative Demand in 2023, and after it filed the initial complaint in this action in November 2024. Compl. ¶¶ 10, 17, 22, 24, 87-88.[1]  These are specific timeframes, and even Rule 9(b) would require nothing more. *See United Healthcare Ins. Co.*, 848 F.3d at 1180 ("a complaint does not need to identify 'a precise time'"). Nor do these timeframes present any problem with the statute of limitations, as they continue well into the statutory periods for the requested relief. *See, e.g.,* 15 U.S.C. § 57b(d) (providing a three-year limitations period for monetary relief pursuant to Section 19); 15 U.S.C. § 45(m) *and* 28 U.S.C. § 2462 (providing civil monetary penalties for violations within five years). These are not allegations about stale conduct.

---

[1] Indeed, the public statements Defendants present for judicial notice appear to confirm that their allegedly unlawful practices relating to "tipping" continued even after the Amended Complaint was filed. *See* Pearl Decl., ECF 51-1 at Ex. 1 (Def. 8-K) (Defendants phased out tipping on February 20, 2025).

-30-

**IV.    The Amended Complaint is Procedurally Proper.**

Defendants mistakenly cite Federal Rule of Civil Procedure 17 as a potential ground for dismissal. *See* Memo at 45 (asserting the amended complaint "must be dismissed" because of Rule 17(a)). Rule 17 is the procedural rule that defines the "real party in interest" and provides that "an action must be prosecuted in the name of the real party in interest." Fed. R. Civ. P. 17(a)(1). It does not provide for dismissal. Fed. R. Civ. P. 17(a)(3). Moreover, the government's complaints have always named the real party in interest. Under Rule 17(a)(1)(G), the real party in interest is the party authorized by statute to pursue a claim. Under the FTC Act, FTC has independent litigating authority and can pursue claims in its own name. *See* 15 U.S.C. §§ 41-58 (allowing FTC to pursue litigation in its own name). To add a demand for civil penalties, this case was referred to, and accepted by, the United States Attorney General, who litigates in the name of the United States under another provision in the FTC Act. Compl. at ¶ 8; 15 U.S.C. § 56(a)(1) (referral to the Attorney General for civil penalties); *and U.S. v. Allied Oil Corp.,* 341 U.S. 1, 4-5 (1951) (The United States is the properly named party in enforcement actions brought by the Attorney General). Thus, the original complaint correctly named FTC, and the amended complaint correctly names the United States.

Of course, Defendants may be upset about their increased liability, but Federal Rule of Civil Procedure 15(a)(1) allowed the government to amend "as a matter of course," and therefore, the amendment did not require Defendants' consent or leave of court. *But see* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave. . ."). Even if leave were required, it would be easily granted here. Rule 15 allows

-31-

amendments with "extreme liberality," reflecting a widespread policy favoring amendments and decisions on the merits. *Id., following Morongo Band of Mission Indians v. Rose*, 893 F.2d 1074, 1079 (9th Cir. 1990) *and Martinez v. Newport Beach City,* 125 F.3d 777, 785 (9th Cir. 1997). Moreover, Defendants cannot support their assertion of "prejudice." *See* Memo at 46. Prejudice from an amended pleading means an unfair disadvantage, and it must be "substantial." *Wizards of the Coast LLC v. Cryptozoic Ent. LLC,* 309 F.R.D. 645, 652 (W.D. Wash. 2015). Defendants have not suffered any disadvantage. To the contrary, Dave used the amendment to request an additional month to prepare its motion to dismiss. *See* Order, Dkt. 47(granting Defendants' unopposed request for these accommodations). And further, although Defendants now purport to have experienced a "sneak[y]," "deliberate and tactical circumvention of the Federal Rules of Civil Procedure," they told their investors that the civil penalties referral was "typical," that the amended complaint is "not a new lawsuit," and that allegations are substantially unchanged. *Compare* Memo at 46 *with* Dave Press Release, Dec. 31, 2024, enclosed with Form 8-K, Pearl Decl., Ex. 1 at 8 ("This is not a new lawsuit, and it is typical for the DOJ to take over litigation of this type. The allegations in the lawsuit have not changed in substance.").[2] A routine early amendment under Rule 15 is not unfair to Defendants.

---

[2] *Also available at* https://investors.dave.com/news-releases/news-release-details/dave-issues-statement-response-amended-ftc-complaint-and

**V.    Defendants' Request for Judicial Notice is Impermissible.**

Defendants request that the court take "judicial notice" of select Securities Exchange Commission filings and Dave press releases purportedly establishing that they "recently transitioned to a simplified mandatory fee structure" and that the CFPB closed an investigation without recommending enforcement action. Memo at 11 n.1, 14, 32; Pearl Decl. 51-1. Both propositions are beyond the allegations in the complaint, and judicial notice of them is improper because they cannot be "accurately and readily determined from" Dave's own statements and press releases, and because those are not "sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Even if an SEC filing is susceptible to judicial notice, that "does not mean that every assertion of fact within that document is judicially noticeable for its truth." *Orexigen Therapeutics, Inc.,* 899 F.3d at 999). And, moreover, even if true, the facts in Defendants' SEC filings would not change the outcome for their motion to dismiss. It should be denied.

## CONCLUSION

The complaint states five counts under the FTC Act and ROSCA based on Defendants' deceptive cash advance product, which promised instant access to substantial cash advances, but instead trapped consumers into membership plans with small offers and high fees.  Accordingly, the Motion to Dismiss should be denied.

Dated: April 7, 2025

Respectfully submitted:

YAAKOV M. ROTH
Acting Assistant Attorney General,
Civil Division
MICHAEL D. GRANSTON
Deputy Assistant Attorney General,
Civil Division
AMANDA N. LISKAMM
Director, Consumer Protection Branch
LISA K. HSIAO
Senior Deputy Director, Civil Litigation
ZACHARY A. DIETERT
Assistant Director

*/s/ Sarah Williams*

SARAH WILLIAMS
Senior Trial Attorney
SEAN Z. SAPER
JOHN F. SCHIFALACQUA
Trial Attorneys
Consumer Protection Branch
Civil Division, United States
Department of Justice
450 5th Street, NW, Suite 6400-South
Washington, D.C. 20001
Phone: (202) 616-4269 (Williams)
Phone: 202-742-7116 (Saper)
Phone: 202-598-8153 (Schifalacqua)
sarah.williams@usdoj.gov
sean.z.saper@usdoj.gov
john.f.schifalacqua@usdoj.gov

*Attorneys for the United States*

**Certificate of Word Count**

The undersigned counsel of record for the Plaintiff United States certifies that this brief contains 9,112 words, which complies with the word limit set by a court order dated January 28, 2025, Dkt. 47.

Dated:  April 7, 2025                          Respectfully submitted:
                                               /s/ *Sarah Williams*

                                               Sarah Williams